Frederic Arthur McCALL, under 21 years of age, who sues through his father and next friend, Captain Charles De-Witt McCall, United States Navy, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 3344.

United States District Court
E. D. Virginia,
Norfolk Division.

July 2, 1962.

Sidney H. Kelsey, Norfolk, Va., for plaintiff.

**422**

C. V. Spratley, U. S. Atty., Norfolk, Va., for defendant.

MICHIE, District Judge.

Frederic Arthur McCall was seriously injured on November 8, 1958 at the United States Naval Base at Norfolk. At the time he was living on the Base with his parents and younger sister, his father being a Captain in the Navy who was stationed on the Base. Frederic was then eight or nine years old (the complaint and the testimony are not in accord as to the exact age).

On the morning of that day Fred and his sister, Corda, who is usually called Koko, got up before their parents and went to ride their bicycles before breakfast and to look for empty coca-cola bottles which they could turn in for a few cents each. They rode over to an area of the Naval Base in which were located what are known as the hobby shop and the country store. They had been there before as this was an area of the Base that children frequently played in. Evidently they thought it a good area for finding empty bottles for they parked their bicycles and began looking for bottles. Fred looked in a government-owned small trailer, generally referred to in the evidence as a "low boy", which was parked in the area. He did not find any bottles but he did testify that he remembers seeing loose in the body of the low boy a large metal pin or bolt.

It is difficult to understand what happened in this accident without understanding the construction and use of this low boy and the use of this bolt and this is difficult to do without resorting to a diagram. Roughly the trailer, in the condition in which Fred saw it, looked something like this:

When the low boy is not hitched to a tractor, the front of it, as can be deduced, is lower than the back and it levels up when the front is raised to be attached to a tractor and at the same time the tail piece at the back, which is called the tailgate or ramp and which is slanted forward when the low boy is not attached to a tractor, becomes more upright. This tailgate is on a hinge and may be lowered at the back and, when so lowered to the ground, forms a ramp upon which articles can be moved into or out of the low boy. When upright the tailgate is held in place by two pins at the rear (not shown in the above sketch), one of which Fred testified he saw lying loose in the body of the truck. There are at the rear of the body of the low boy pieces of metal with holes in them which protrude at the rear from each side of the body of the truck and there

are corresponding holes in the body of the tail piece so that when the tail piece is raised these protruding pieces of metal go through the holes in the tail piece and the pins or bolts are then put through the holes so that the tail piece cannot fall or be lowered without removing the pins.

Obviously the pins had not been put in place when the low boy had been left parked near the country store the night before the accident. For, a moment or so after Fred saw the pin in the body of the low boy, he was standing behind the low boy and the tailgate fell and hit him on the head, severely injuring his head and brain.

Koko apparently did not see the accident, though she had seen the ramp upright a moment before the accident and saw it down a moment later with Fred standing there with "a hole in his head." Fred's testimony as to whether he actually saw the ramp falling on him or only realized it had fallen after it hit him is, perhaps naturally, hopelessly confused. There were no other eyewitnesses and at the trial the government tried to prove that (or at least to speculate whether) the accident might have been caused by Fred's riding his bike into the ramp or falling off a nearby pile of lumber. But the medical evidence as to the brain damage and the type of injury that must have caused it pretty well disposed of those theories and on the argument of the case the government conceded that the accident must have been caused as Fred said it had been.

What caused the ramp to fall? This must remain a matter of speculation. It could not have fallen had the pins been in their place. But even with the pins absent, since the ramp is normally slanted substantially forward when the hitch of the low boy is on the ground, it could not fall backwards unless some fairly considerable force were exerted upon it. But there was testimony from Koko that the ramp was standing up perfectly straight at the time of the accident and from Mrs. McCall, who came on the scene somewhat later, that the body of the trailer was then perfectly level and not slanted down slightly toward the front as it would have been if the hitch had been resting on the ground. It is possible therefore that the hitch might have been carelessly let down on a stone or a block of wood which might have gotten there accidentally from one of several piles of lumber which stood nearby. And if the hitch were resting on some such object the body of the truck would have been level and the tailgate would have been standing so nearly perpendicular that a heavy gust of wind might have blown it over. But, whatever the cause of the fall of the tailgate, fall it did and it would not have fallen had the tailgate bolts or pins been in place.

Who was responsible for the bolts being out of place? The trailer was one of several on the base which were operated under the general direction of Mr. Charles R. West, Jr., an employee of the Base, whose evidence gave the impression that he feared that some one was going to blame him for the accident and, if so, this feeling might have led him into the rather serious conflict of evidence which developed between him and certain of his employees.

Mr. West testified that there were two principal uses for these trailers. One was hauling lawnmowers in the morning from "the shop" (evidently in the vicinity of the site of the accident) to various parts of the Base for use and then picking them up in the afternoon for return to the shop. He said that when this use was made of a trailer the ramp was put down to facilitate the removal of the lawnmowers from the trailer to the shop and left down for the night so that the lawnmowers could be readily reloaded on the trailer the next morning.

The other major use for the trailers was for hauling tree stumps and logs found on the base to a dump and disposing of them there. On such occasions, Mr. West testified, the tailgate would be left up at the end of the day because otherwise "You'd have to go back and pull pins out and push the tailgate and let it go down" and, presumably, put it

up again the next morning. If Mr. West should be believed the tailgate would always either be left up after hauling logs, with no occasion to remove the pins as part of the daily process of letting it down, or would have been let all the way down to get the lawnmowers off after being used for hauling them.

But Mr. West's neat solution for the government was blown sky high by the testimony of his own employees (all the witnesses had been segregated during the trial). Two of his employees did support him, one of whom said he was primarily a yardman but used trailers occasionally. But four of his men testified that they always let the tailgate down at the end of the day's work, irrespective of what the work had been, that there was a safety rule to that effect and that Mr. West himself had advised them of the safety rule. One of them also testified that the safety rule had been in effect for at least six years.

The natural inference from all this is that the night before the accident one of the workmen was in the process of lowering the tailgate in accordance with the safety rule and had gotten the pins out and tossed them into the body of the trailer when his attention was distracted by something—perhaps a call from a friend passing—perhaps some other incident—so that he paused in his work and then went off forgetting that he had not finished what he was doing.

At any rate it seems clear that the accident would not have happened if the government's own safety rule had been complied with.

But the government argues that the evidence does not exclude the possibility that the tailgate may have been put down in accordance with the safety rule the afternoon before the accident and then, during the evening or night, raised and left in the upright position by teenage children or drunken sailors (off-duty and therefore not acting within the scope of their employment so that the government would not be liable for their actions) who might have taken a notion to play with the low boy and left the tailgate in the dangerous position in which it must have been the following morning. This is of course a possibility, though purely speculative and completely without evidence to suggest it.

■■ The natural inference when an instrumentality is found left in a dangerous condition is that it was left in that condition by those who normally operated and controlled it. Does the plaintiff have the burden of negativing the remote possibility that there might have been intervention on the part of others? I think not. Circumstances alter cases and there undoubtedly may be cases in which the chances of such intervention on the part of others is so great that the plaintiff cannot carry his burden of proof without negativing the possibility, or at least the probability of such intervention. But this is not such a case. The possibility of the intervention of other people here seems to me to be so slight that to require the plaintiff to negative such possibility would seem to me to require him to prove his case not merely by a preponderance of the evidence and not merely beyond a reasonable doubt even—but to what would be practically a mathematical certainty.

The defendant relies upon Gilmer v. Southern Railway Co., 202 Va. 826, 120 S.E.2d 294. In that case the defendants were Ford dealers who held under lease a sales lot adjacent to the Southern Railroad on which they kept about fifty used cars, on the average. The public was generally welcome on the lot to look at the vehicles, apparently even in the absence of any of the employees of the concern. One night a heavy truck, parked on this lot, rolled backwards off the lot onto the property of the Railway Company and damaged a radio tower on the Railroad's property. The Railroad sued the defendants. The truck was found after the accident to be in neutral gear, the brake released and the battery dead. But an employee of the defendants who apparently was the last employee who had had the truck out of the lot, and this several days before the accident, testified

that when he had thereafter parked the truck on the lot he put it in the lowest of its gears, put the hand brake on and removed the keys.

The jury, under the instructions of the court below, brought in a verdict for the plaintiff but the Supreme Court of Appeals reversed this decision, saying at p. 297 of 120 S.E.2d:

"In the case at bar the record discloses there was some explanation offered concerning the cause of the accident. The uncontradicted evidence was that Banks, defendants' employee, secured the plunger type hand brake on the truck, which had to be entirely on or completely off; that the truck was in the lowest of its eight gears; that it had remained on the unfenced lot in the position it was parked 'several days' prior to the accident which happened during a time the lot was closed for business, and that when the truck was inspected after the impact the brake was released and the motor was in neutral gear; both were mechanically in good working condition. While there was no positive evidence introduced that a trespasser or a third person came upon the lot and caused the truck to roll into plaintiff's tower, the jury could have reasonably inferred from the evidence that the truck had been tampered with by some one other than defendants or their employees. In fact, Instruction No. 4 told the jury that if they believed from the evidence such to be the case they should find for defendants. The vehicle was not under defendants' exclusive control at the time the accident occurred. Assuming there was no explanation offered as to the cause of the accident it could have been attributable to causes for which the defendants were not responsible. * * * *"

This case has certain similarities to the case at bar. But there are two significant distinctions. In the Gilmer case there was positive and uncontradicted evidence by the defendant's employee who had last had the car out that when he parked it he put it in the lowest gear and put on the hand brake. There is no such evidence here. The evidence is merely as to the custom of the defendant's employees—and that evidence is contradictory. And in the Gilmer case the public was invited on the sales lot and some member of the public might well have gotten in the truck and tested the gears and taken off the brake. Indeed that must have been the basis for the decision of the court. But in the case at bar there was certainly no invitation to the public to play with the low boy. And while it is, of course, remotely possible that some member of the public did do so, the possibility seems too remote to be decisive in this case in view of the strong probability that the defendant's employee who worked with the truck the day before the accident left it in the condition we have found it to have been in on the morning of the accident.

I have reached this conclusion without reference to the doctrine of *res ipsa loquitur* though the doctrine was discussed by counsel in argument and briefs. However I do not think it applicable to this case. The doctrine is in the main concerned with liability where the cause of an accident cannot be ascertained or lies peculiarly within the knowledge of the defendant as in the case of railroad wrecks resulting from some failure in the equipment. And a typical fairly recent case is United States v. Hull, 195 F.2d 64, (1st Cir. 1952) in which a raised post office window fell unexpectedly on the plaintiff's hand and injured it. There was no explanation of why the window fell and the court applied the doctrine of *res ipsa* since the window was within the control of the United States.

As stated in 65 C.J.S. Negligence § 220(4), p. 999, there are four essential elements for the application of the *res ipsa* doctrine and in this case two of these elements are missing. The first element is that the defendant must have

superior knowledge of the cause of the accident. But in the case at bar both parties know that the accident was caused by leaving the tailgate upright with the retaining bolt or pin removed. The second element in *res ipsa* is the absence or unavailability of direct evidence of negligence and, as indicated above, there is no such lack here. The accident was clearly caused by leaving the ramp upright with the safety pins removed. The only possible dispute is as to who was guilty of the negligence that caused the accident. Here we must rely upon the natural inference that arises from the known facts and that inference is that the negligence that caused the action was the negligence of the government employee who last had the low boy in charge, there being no evidence that any one else had any contact with the trailer and the possibility of any third party having tampered with it being so remote as to be negligible.

█ What then is the amount of damage that the plaintiff is entitled to recover? The injury was severe. Plaintiff had a 2½ inch cut in his forehead from which the brain was extruding when he reached the hospital. There were multiple depressed fragments of bone driven down into the brain tissue. In the operation these fragments had to be lifted out one at a time and the wound irrigated resulting in considerable bleeding. Twelve large fragments were so removed. A considerable portion of the brain itself was lost. And a considerable portion of the dura or brain cover had to be replaced by a graft.

Plaintiff stayed in the hospital three weeks after this first operation and when he came out his brain was still covered only by his scalp so that he was required to wear a football helmet for protection for a period of approximately eight months. After that period he underwent a second operation in which a plastic plate was inserted to protect the hole in his skull and he stayed in the hospital for about a week. But four months later the plate broke loose and his brain could be seen pulsating. He then underwent a third operation in which a new plate was inserted and he remained in the hospital for nine days.

There is evidence, to some extent controverted, that the result of all these operations and pain had an adverse effect upon Fred's character and disposition and he has for this reason been under treatment by a psychiatrist for some time. He will never be able to participate in sports that involve physical contact. And certain types of employment, such as military service, will be forever barred to him. Possibly more serious than any of these is the chance that Fred may later develop epilepsy as a result of this accident. The several doctors who testified as to this rated the chances of it from a low of 3% to a high of 25%. Strangely enough from the point of view of a layman, the medical testimony is unanimous that, in the absence of some such unexpected development, Fred's brain will be as useful hereafter as it would otherwise have been—despite the loss of a good part of it!

There are so many intangibles here and future developments are so uncertain that it is more than usually difficult to arrive at a fair monetary estimate of Fred's damage. However taking into consideration Fred's pain and suffering, his permanent handicaps, the possibility of a character change for the worse, his physical handicaps and the possibility of still more serious trouble that may ultimately ensue, I believe that $40,000.00 is a reasonable figure at which to assess his damages, feeling that that figure is somewhat excessive for the damages sustained to date, the excess being allowed because of the possibility of future difficulties.

Judgment will be entered accordingly.