**Meyer Harris COHEN, also known as Mickey Cohen, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**Civ. A. No. 8789.**

United States District Court
N. D. Georgia,
Atlanta Division.

March 21, 1966.

Charles O. Baird, Jr., Atlanta, Ga., J. Victor Barr, Jr., Nashville, Tenn., Melvin Belli, San Francisco, Cal., Dahlstrum & Walton, Los Angeles, Cal., for plaintiff.

Charles L. Goodson, U. S. Atty., Julius M. Hulsey, Asst. U. S. Atty., Atlanta, Ga., for defendant.

SIDNEY O. SMITH, Jr., District Judge.

This is an action for damages brought pursuant to the provisions of the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b), 2671 et seq. by plaintiff, who at the time of the injury was a prisoner at the United States Penitentiary, Atlanta, Georgia. The particular injuries were suffered as the result of a physical beating by another inmate in the penitentiary. See Muniz v. United States, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963).

The main thrust of plaintiff's suit is that the Government was negligent in failing to prevent the assault upon him by the other inmate, Berl Estes McDonald, who was contended to be a "mentally abnormal" person.[1] The Government, on

---

1. The specific allegations of negligence are:

(1) In the confining of said Berl Estes McDonald in a penitentiary and in a manner where he could intermingle with any other prisoners;

(2) In failing to have sufficient guards at the particular location of the detention of said Berl Estes McDonald; within the penitentiary;

(3) In the failure of the guards at said location to properly execute their assigned duties;

(4) In the failure to provide adequate physical barriers and other security and safeguards which would prevent the ingress and egress of said Berl Estes McDonald from the particular location of his detention within the penitentiary;

(5) In the failure to have sufficient guards and other security and safeguards to prevent the said Berl Estes McDonald from traveling through the penitentiary

the other hand, asserts that it exercised ordinary care in the keeping of both prisoners. There is no contention that the two inmates personally knew each other or that there were any prior dealings between them. Thus, there is no problem as to whether the assault on plaintiff might be "justifiable" under state law. See Simonton v. Sauls, 74 Ga.App. 3(1), 38 S.E.2d 632; Thompson v. Shelverton, 131 Ga. 714(1), 63 S.E. 220.

The case was regularly tried by the court. Subsequently, but prior to submission of proposed findings to the court or any finding by the court, plaintiff moved to reopen to present newly discovered evidence which was granted and further trial held. See Gas Ridge, Inc. v. Suburban Agricultural Properties, Inc., 150 F.2d 363(8) (5th Cir. 1945); Bowles v. Six States Coal Corp., D.C., 64 F.Supp. 651 (1946); 6 Moore, Federal Practice, § 59.04(13).

From the evidence adduced on the trials, the court makes the following

## FINDINGS OF FACT

(1) *The assault.*

The United States Penitentiary, Atlanta, Georgia, is a maximum security institution, housing approximately 2,300 inmates, a great majority of whom are under long sentences. Many inmates have escape records and aggravated criminal records or adjustment difficulties in the institution and other institutions where they have been confined. Both Cohen and McDonald were legally confined in said penitentiary in August, 1963, and were under the care, custody, and control of the Government.

As a maximum security institution, the Atlanta Penitentiary has a walled perimeter which provides close custody. The wall is manned by guards in towers. This tight perimeter security permits a freer movement and less regimentation of inmates within the walls, facilitating rehabilitation programs such as prison industries, vocational training shops, educational programs and recreation.

Within the maximum perimeter of the penitentiary is located the Associate Warden's Building (commonly referred to as the AW Building). Its purpose is to house prisoners in two categories: punitive segregation and administrative segregation. Punitive segregation is imposed by the prison authorities for breaches of discipline and is normally limited to 10 days; administrative segregation is imposed on various categories of prisoners, including unmanageable and dangerous inmates, repeated disciplinary problems, and persons under investigation or awaiting trial, and is imposed for longer periods, usually of 30 days or more. The purpose of the AW Building is absolute segregation and that inmates be kept there until properly released. According to the Warden, the duty of the guards is to keep such prisoners there for "disciplinary purposes, for our protection, and for the protection of others."

Generally, prisoners at Atlanta are classified upon admittance as (1) close custody, (2) medium, (3) medium out, or (4) minimum. Activities and work assignments vary according to classification. However, in keeping with rehabilitation policy, all prisoners outside the AW Building have, except for specified periods, free access to the yards and

grounds and buildings and entering the radio shop;

(6) In the failure of the guards to properly execute their assigned duties and as a direct result allowing the said Berl Estes McDonald to travel through the penitentiary grounds and buildings and enter the radio shop;

(7) In the failure to provide adequate security and safeguards to prevent said Berl Estes McDonald from acquiring possession of a length of metal pipe which

he thereafter used as a weapon as aforestated;

(8) In the failure to have sufficient guards and other security and safeguards within the radio shop to prevent the attack upon plaintiff as aforestated;

(9) In the failure of the guards within the radio shop to properly execute their assigned duties and as a direct result allowing the said Berl Estes McDonald to attack the plaintiff as aforestated.

buildings within the controlled secure perimeter.

Berl Estes McDonald was, on the occasion in question, a 33 year old white male. Except for two short periods in the Army and Navy he has been incarcerated almost continuously since age 16, having served sentences for Larceny, Forgery, Robbery, Assault, Kidnapping, Escape, Narcotics and Grand Larceny. He was a known narcotic addict and had been hospitalized in the South Carolina state mental institution and in a United States Navy base hospital for nervous disorders and drug addiction.

Upon his admission to the Atlanta penitentiary in June, 1960, his medical examination showed a history of psychiatric treatment, inconclusive findings of psychoneurosis, sociopathy, neurological disorder, but no finding as to mental deficiency or psychosis, that is, active insanity, at that time. There had been one prior notice of psychotic diagnosis by South Carolina authorities in his file.

In September, 1960, at Atlanta, he had a fight with another inmate. In October, 1960, he was cited for creating a disturbance in the cell house. In December, 1960, he assaulted another inmate with a knife, inflicting four wounds on his body. Under court direction, in March, 1961, he was examined by Dr. Lipton, psychiatrist, Dr. Bryan, clinical psychologist, and Dr. Pirkle, Public Health Service medical director.

At that time, he was generally classified as being in a "constitutional psycopathic state, emotional instability." He was specifically classified as paranoid with "considerable likelihood of his having recurrent psychotic episodes in the future, under situations of stress." The general classification refers to emotionally immature persons, who are impulsive, aggressive types in repeated conflict with the law and society. Up to 80% of the population of the Atlanta penitentiary fall into this general classification. Approximately one-third have assaultive backgrounds and approximately 200 are serving sentences for crimes of violence. The specific classification of paranoid refers to persons within the general classification who have ideas and delusions of persecution directed toward others, frequently with no cause whatsoever. Various paranoids believe they can read another's mind and determine that they are after him. This sometimes results in psychotic episodes such as assaults, fights, suicides, refusal to eat, etc. In fact, in McDonald's case, this had resulted in the December assault when he knew from the victim's attitude and speech that he would cut him, if he didn't "beat him to the draw." In 1961 it was concluded that McDonald be placed in maximum security and under continued psychiatric supervision.

Later in 1961 he was transferred to Leavenworth (the other maximum security institution maintained by the government since the closing of Alcatraz). His psychiatric record was reviewed and he was diagnosed as a sociopathic personality, which is the equivalent of his general classification of constitutional psychopathic state. Because of poor emotional control, it was recommended that he be given a "job assignment which would limit interpersonal relationships and minimize situational difficulties," as well as a single cell.

There was no further psychiatric evaluation of McDonald by the government in 1962 or in 1963 prior to the assault on plaintiff. Prior to the summer of 1963 he was returned to Atlanta. On June 1, 1963, he was placed in administrative segregation and released after a short stay.

On June 22, 1963, McDonald was placed in the Associate Warden's Building, confined to administrative segregation, based upon information that McDonald had threatened another inmate and had forced this inmate to give up items which he had purchased at the Penitentiary Commissary, described by the prison officials as "strong arm tactics." He remained there until August 14, 1963.

The AW Building is a two-storied brick building. The first floor contains cells for punitive segregation and the second floor contains cells for administrative

segregation with a guard on each floor. Inmates in punitive segregation have distinctive clothing, while those in administrative segregation have the normal prison garb worn by the general prison population. Outside the AW Building, it cannot be determined whether a prisoner is in administrative segregation by his clothing. Adjacent to the AW Building is an enclosed exercise yard connected to both floors by steps.

Officers at the institution were directed to give yard privileges for inmates confined to administrative segregation in the AW Building. Such inmates were permitted to go to the yard in groups of not more than three at a time.

On August 14, inmate McDonald, along with two other inmates, was permitted to go to the exercise yard. Officer T. E. Bryan placed the three inmates in the yard at approximately 8:40 A.M. on August 14, 1963. At this time Officer Bryan observed nothing unusual in regard to inmate McDonald. The exercise yard is located on the rear of the segregation building itself. The yard is an area of 40 x 60 feet, walled on three sides by a 10½ to 11 foot brick wall, and on the fourth by the segregation building itself. There was no wire screen on top of the brick wall and there was no electrical warning device on top of the wall around the exercise yard. Inmate McDonald was allowed to have with him in the exercise yard a dumbbell measuring approximately 12 to 13 inches in length. There was no guard placed over the inmates in the exercise yard, although that exercise yard was under the surveillance of two posts— Tower #1 officer who observed the yard at irregular but frequent intervals, and the officer in administrative segregation, who looked into the yard at irregular but less frequent intervals. The Tower #1 guard's responsibility was to keep surveillance not only on the exercise yard of the segregation building but also over the outside perimeter wall and other areas that are inside the confines of the institution.

McDonald was of muscular athletic build and had the reputation of devoting much time to body-building and physical fitness. Either by scaling the wall, or by use of the dumbbell, or with the aid of the other inmates, he succeeded in getting over the wall of the exercise yard and immediately proceeded some 500 feet across the prison property undetected to the "Radio-TV" building.

Upon this occasion Meyer Harris Cohen was assigned to the tool room of the Electrical Shop which is adjacent to and part of the same shop area as the Radio-TV Shop. Inmate Cohen was seated in a chair beside the desk of Instructor Romedy. Instructor Romedy was seated behind the desk talking to inmate Cohen. Inmate Cohen's back was to the corridor leading into the Electrical Shop. Mr. Romedy was the only employee in the Electrical Shop and Radio-TV Shop area, all supervisors from the Electrical Shop having left the building to work in other parts of the institution. There was no guard at the door leading to the Electrical Shop and the barred door was not locked.

Inmate McDonald suddenly struck inmate Cohen on the back of his head with a conduit pipe curved on one end. Instructor Romedy jumped to his feet, shouted to inmate McDonald to stop and then phoned the alarm in order to summon help. Inmate Cohen was struck three times on the skull with the conduit pipe. There is no knowledge as to how inmate McDonald obtained possession of the pipe though various electrical supplies were stored along the corridor leading to the electrical shop.

Various officers answered the alarm and the Radio-TV building was sealed off. Officer Thompson met McDonald between there and the AW Building and apprehended him. At that time McDonald "said he had got one and named Mickey Cohen." In McDonald's hand was the white conduit pipe with blood stains on the end.

Shortly thereafter, McDonald was reexamined by Dr. Lipton under court direction and was found to be completely psychotic and unable to stand trial for

the assault on Cohen and was committed. In the opinion of Dr. Baker, who had examined him at Leavenworth in 1961, McDonald was "probably psychotic at the time of the assault and for a period of time preceding that assault."

In September, 1961, another inmate Benny Lurk was placed in administrative segregation for an assault on a fellow prisoner in the kitchen. On November 17, 1961, he was given exercise privileges in the same yard under the same conditions. With the aid of a mop, he succeeded in getting over the wall and going to the hospital for his avowed purpose of seeing a doctor. Lurk was only 5′ 5″ and much smaller than McDonald. Between the AW Building and the hospital, another inmate, Thornton, met him. McDonald spontaneously told him "he was hot," meaning a status of escape. Thornton followed him to the hospital and saw him brought out after being apprehended by the officers. As a result, Lurk's yard privileges at the AW Building were revoked for 90 days by the acting associate warden, Farr, who had assisted in apprehending him. Farr had the prime responsibility for the AW Building at the time of Lurk's escape and was still in charge at the time of McDonald's escape, which occurred approximately 21 months apart. No changes were made in the yard or its enclosure in the intervening period. (This evidence was produced when the trial reopened.)

(2) *Injuries.*

Plaintiff, as a result of the assault, was grievously injured. When first admitted to the prison hospital he was unconscious and had a midline skull wound approximately 6 inches long, 3 inches wide, and 1½ inches deep. X-rays showed indriven bone. Dr. Charles Dowman, an Atlanta neurosurgeon, was brought in and operated, removing the crushed portions of the skull and a little over 1 ounce of damaged brain. His skill undoubtedly saved plaintiff's life.

As a result of the injury, plaintiff received extensive damage to his central nervous system resulting in immediate complete paralysis of his legs and partial paralysis of his left side, left arm and face, and spasticity in the affected parts.

On October 2, 1963, he was transferred to the Medical Center for Federal Prisoners, Springfield, Missouri, where he is still a patient. Without recounting the various extensive medical procedures undergone by Cohen, in general since that time he has had a subsequent operation placing a metal plate in his skull, has been fitted with various braces, and given extensive therapy which he is still undergoing. In the 2½ years since the injury, he has in every instance received the very finest medical help available from a group of skilled, devoted doctors, specialists, and therapists.

Unfortunately, the best medical opinion is that he has now reached optimum recovery. Recent examinations by government and private specialists place his permanent disability at a minimum of 50%. His left leg has a permanent weakness and must be partially dragged; his left arm has a permanent weakness and he has little dexterity in his left hand; his right leg is better, but weak. His normal locomotion is by wheelchair. With the aid of a crutch cane, he can walk on flat surfaces with great difficulty and can get up and down stairs at a slow pace. However, if he falls flat, he is unable to get up by himself. His gait is unsteady, spastic, and stiff-legged with half-steps. In order to do any kind of work, he must sit and use his right-hand only and is totally disabled for any hard labor.

His mental condition and eyesight, although temporarily injured, are completely restored. His present IQ is higher than 15 years ago. His senses of smell, sight, touch, hearing and speech are normal. He writes well and has sexual responses.

He is completely cooperative, diligent and determined in all medical procedures. He shows an 8 inch scar on his scalp following the insertion of the plate which was custom cast to fit his skull. He is, of course, anxious and worried about his disability and probably will have to have some nursing care hereafter, though not

necessarily of a professional nature. The possibility of post-traumatic epilepsy or convulsions is remote, only 4 or 5%, but he will be lame and crippled permanently.

### (3) Damages.

At the time of the injury, plaintiff was 51 years old and had a life expectancy of 20.39 years. He was a former professional boxer and was in excellent physical condition.

He has no memory of the incident and his first recollection following was going on the train from Atlanta to Springfield some six weeks after the assault. Since that time he has been in constant pain. For awhile his head hurt resulting from brain swelling, and this was partially relieved by a spinal tap. He has undergone two delicate and serious brain operations. According to all doctors, his was an extremely severe and painful injury. He has been on various pain-relieving drugs and presently takes 3 capsules a day as prescribed. He moves only with great effort and with considerable actual pain. He can dress himself only with great difficulty and toilet and bath use are likewise difficult. His present routine involves being "stretched" for 15 to 30 minutes prior to therapeutic exercises and walking for 1½ to 2 hours per day. The remainder of the time is sedentary.

His medical care has been extensive and expensive, but the government has borne the entire cost. His ability to labor is greatly impaired. He was formerly a very active person physically, but lived primarily by his wits in gambling operations. He has no special talents and must be retrained to perform any task requiring technical skill.

### CONCLUSIONS OF LAW

*Standard and Duty of Care.*

■ This case, of course, is controlled by United States v. Muniz, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805. In many respects, the factual situation is similar. There it was clearly held that "the duty of care owed by the Bureau of Prisons to federal prisoners is fixed by 18 U.S.C. § 4042, independent of an inconsistent state rule."

18 U.S.C.A. § 4042 provides:

"The Bureau of Prisons, under the direction of the Attorney General, shall—

(1) have charge of the management and regulation of all Federal penal and correctional institutions;

(2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise;

(3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States.

This section shall not apply to military or naval penal or correctional institutions or the persons confined therein."

■ Certainly, however, the duty owed prisoners under state law is persuasive and is of some value as to the standards which ought to be imposed. In Georgia, while the state retains immunity in such cases, the individual jailors may be personally liable, as well as their bondsmen. Thus, "A sheriff owes to a prisoner placed in his custody a duty to keep the prisoner safely and free from harm, to render him medical aid when necessary, and to treat him humanely and refrain from oppressing him; and where a sheriff is negligent in his care and custody of a prisoner and as a result the prisoner receives injury or meets his death, or where a sheriff fails in the performance of his duty to the prisoner and the latter suffers injury or meets his death as a result of such failure, the sheriff would, in a proper case, be liable * * *." Kendrick v. Adamson, 51 Ga. App. 402(2), 180 S.E. 647. His duty is clearly "to exercise ordinary diligence to keep his prisoner safe and free from harm." Thomas v. Williams, 105 Ga. App. 321 at 327, 124 S.E.2d 409 at 413. This standard has long been known to federal officers. See Asher v. Cabell, 50 F. 818 (5th Cir. 1892) where it was held that the United States Marshal owed a duty of "safe-keeping and pro-

tection from unlawful injury" to a prisoner who was killed by a mob. See also Hill v. Gentry, 280 F.2d 88, cert. den. 364 U.S. 875, 81 S.Ct. 119, 5 L.Ed.2d 96. As the Federal Tort Claims Act[2] results in liability "if a private person, would be liable to the claimant," it appears that the standard of care due a prisoner under either the federal statute or the state rule is the same, namely, to exercise ordinary care for the prisoner's protection and to keep him safe and free from harm. In the absence of ordinary care the government becomes liable under the Act unless there is some special exceptions created by Congress.

*Exceptions.*

In this case the government has again advanced the exceptions claimed under 28 U.S.C.A. § 2680(a) and (h). This statute provides for freedom of governmental liability upon:

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

(the "discretionary" exception)

"(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."

(the "assault" exception)

*Muniz,* without specifically ruling on the applicability of either exception to a particular case, concluded that none of the exceptions (of 28 U.S.C.A. § 2680) precluded bringing suits such as this. United States v. Muniz, supra, 374 U.S. at 153, 83 S.Ct. 1850. The determination of either exception was left for the district courts on the facts of the particular claim.

 Undoubtedly the "discretionary" exception would apply to many claims, such as visitation rights, place of confinement, transfers, disciplinary forfeitures, and the like of the type constantly sought to be raised by habeas corpus. All of such matters are discretionary functions and duties under the overall supervision of the Attorney-General. Thus there is no hesitancy in sustaining such exceptions as to an administrative decision imposed on the claimant. See Morton v. United States, 97 U.S.App.D.C. 84, 228 F.2d 431. The point was inferentially raised at the Circuit level in *Muniz* when the court rejected the theory that the grant of authority over prisons to the Bureau of Prisons insulated the government from any liability in its execution. Muniz v. United States, 2 Cir., 305 F.2d 285(1). The exclusion is properly limited to the planning level and not the operational level; and to acts of a governmental and not a ministerial function. See Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427. Thus, it may protect against an improvident high-level decision, but not against a negligent act, even though some discretion is involved in each. Whatever is done or not done at any institution involves a decision by someone, but this does not mean that all acts are exempt from tortious liability as discretionary. Fair v. United States, 5 Cir., 234 F.2d 288(b).

**2.** (b) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

The "assault" exception has been specifically raised on several occasions and rejected by the courts as inapplicable in cases such as these. It now appears clear that this subsection applies only if the assault is inflicted by a government employee. Panella v. United States, 2 Cir., 216 F.2d 622.; Muniz v. United States, 2 Cir., 305 F.2d 285.

Only recently, the two exceptions were reviewed and rejected in a suit where one prisoner assaulted another and the claimant contended that the negligence of the government was the effective cause. Fleishour v. United States, D.C., 244 F.Supp. 762 (1965).

*Negligence.*

Accordingly here, the case turns on the question of whether the government was negligent in permitting McDonald to inflict the assault on Cohen. By no means is the government an insuror of the safety of a prisoner. This is not the philosophy of the Federal Tort Claims Act, and the government has the same status as any private party in such matters. Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48.

While there is some element of an incontestible administrative decision regarding the conditions of confinement between the prison officials and the person confined, as regards third persons, (including other prisoners), it is reasonable to conclude that some duty of care is owed in this regard. As seen, the government has a duty of protection and safekeeping. In the discharge of that duty the government must exercise ordinary care in (1) the classification of prisoners and in (2) the custody of prisoners properly classified.

Thus, upon admission of an inmate, a reasonable assignment to a proper custody category, i. e. minimum, medium, maximum, etc. must be made on the basis of prior record and mental and psychiatric reports on the prisoner. This is a continuing duty and possible reclassification may result from behavior, further testing, and observation during the course of confinement. Thus, a reasonable assignment upon admission might not be reasonable five years later, dependent upon the prisoner's conduct in the interim.

Once a classification is made, then the government has the duty to take reasonable care in the maintenance of his custody. While the standard of ordinary care remains the same, obviously more supervision is needed for a person in close custody, than one in minimum or "trusty" status. The greater the need for close confinement then the more is required in preserving that status.

Measured by the above, the facts of this case lead to the conclusion that the government was negligent in regards to its supervision of McDonald. Here, a recommendation was made in 1961, following a series of assaultive incidents and upon a history of psychotic episodes, that he be placed in maximum confinement status. In 1963 a new series of assaultive incidents began and, based thereon, McDonald was placed in administrative segregation in the AW Building, the ultimate available in security. If his conduct and history were such as to justify such placement, then he should not have been allowed to escape therefrom. What constitutes proper supervision of a minimum or medium prisoner would fall far short of what constitutes proper supervision of a person in maximum segregation as "unmanageable or dangerous." As seen, the government was on notice of McDonald's psychotic tendency and the "considerable likelihood of his having recurrent psychotic episodes." It was likewise on notice that it was possible for an unsupervised inmate to get over the wall of the exercise yard. To state that the care taken was sufficient for "most" cases or generally accepted procedure in penal institutions omits the human failure of those persons charged with the direct operational duty of keeping such segregated prisoners confined. There was no shortage of manpower. Two or more guards were present at the AW Building

---

---

at all times and the escape took place within a few feet of the guard on Tower No. 1. Except in the exercise yard, all prisoners in segregation were under lock and key or under direct control of a guard.

This is not to say that all prisoners with assaultive records must be locked in a cell. See Fleishour v. United States, D.C., 244 F.Supp. 762. Admittedly there is a high incidence of such persons in any prison population. However, where an assaultive individual has a psychiatric record such as the one revealed here, it would be negligence to grant him the freedoms of any other prisoner. Having made the proper decision to place McDonald in maximum segregation, the government was bound to take the necessary steps to enforce that decision. In this respect it failed.

No negligence is found in the general prison plan, nor in the operation of the Radio-TV building, nor in the ratio of guards per prisoner, nor in the freedom of movement generally permitted outside the AW Building within the main perimeter. Had a fellow prisoner not in segregation and within the normal emotional range of prisoners committed the assault on Cohen in the dining hall or the Radio-TV shop or elsewhere, there would be no hesitancy in finding for the government. But here, the government failed to provide protection when it had already decided protection was necessary. We are persuaded in this finding by the existing burdens placed on government institutions when psychiatric problems are involved. See Fair v. United States, 234 F.2d 288 (5th Cir. 1956); Underwood v. United States, 356 F.2d 92 (5th Cir. 1966).

*Damages.*

At pre-trial, the damages were stipulated to cover pain and suffering which, in Georgia, includes the "loss of ability to labor." The measure is the "enlightened conscience" of the trier of fact. See Atlantic Coast Line R. Co. v. Ouzts, 82 Ga.App. 36(4), 60 S.E.2d 770.

[16–19] As to such damages, they are grievous. Despite the conscientious effort of the plaintiff toward recovery and despite the splendid medical help furnished him by the government, it is apparent that Cohen has been painfully transformd from a healthy vigorous man to an invalid through no fault of his own. There can be no assumption of risk by a prisoner and there is no contributory negligence here in mitigation or reduction of damages. See Cole v. United States, D.C., 249 F.Supp. 7. It is a marvelous commentary on our legal system that this claim can be prosecuted without regard to plaintiff's standing as a prisoner or ward of the state. It is equally valid that his status should not preclude him from just compensation upon a showing of liability. Considering that medical expenses normally recoverable have already been borne entirely by the government to the extent of thousands of dollars, but considering also the extent of permanent injury, the total damage is fixed at One Hundred Ten Thousand Dollars ($110,-000.00). This is believed to be well within the range awarded for pain and suffering for similar debilitating injuries to nonprisoners. United States v. Grigalauskas, 1 Cir., 195 F.2d 494; Cowan v. Inland Waterways Corp., D.C., 121 F. Supp. 683; Christopher v. United States, D. C., 237 F.Supp. 787; McCall v. United States, 206 F.Supp. 421; Collins v. Virgin Islands, 236 F.Supp. 441. Likewise, it is considered to be within the range of jury verdicts in this District.

In accordance with 28 U.S.C.A. § 2678, attorneys fees are fixed within the limits prescribed at Fifteen Thousand Dollars ($15,000.00). This considers the fact that the case was aggressively prepared and presented.

Judgment may be presented in accordance with these findings.

The difficulties foreseen in the future handling of prisoner's claims prompts an additional comment as to a possible solution. There already exists a compensation system for injuries received by prisoners while working in a prison in-

dustry or while maintaining and improving the institution of confinement. 18 U.S.C.A. § 4126. See Winston v. United States, 2 Cir., 305 F.2d 253. Already the courts are troubled when an innocent prisoner receives an injury elsewhere, but no recovery is allowed because of the absence of negligence on the part of the government. See Fleishour v. United States, D.C., 244 F.Supp. 762 at 767 (5). An automatic compensation system covering all prisoners "within the scope of their employment" would produce surer and more uniform results.

The customary exclusions due to the wilful misconduct by the claimant would amply protect the government against the spurious claims now feared by the Bureau of Prisons following *Muniz*.[3] The instant case is decidedly not such a claim.

It is so ordered.

---

**3.** For example, the present Georgia Workmen's Compensation statute provides: "No compensation shall be allowed for an injury or death due to the employee's wilful misconduct, including intentionally self-inflicted injury, or growing out of his attempt to injure another, or due to intoxication or wilful failure or refusal to use a safety appliance or perform a duty required by statute, or the wilful breach of any rule or regulation adopted by the employer and approved by the State Board of Workmen's Compensation, and brought to the knowledge of the employee prior to the accident. The burden of proof shall be upon him who claims an exemption or forfeiture under this section." § 114–105 Ga.Code Anno.