Lawrence HOLT et al., Petitioners,

v.

Robert SARVER, Commissioner of Corrections, Respondent.

Travis Eugene FIELDS et al., Petitioners,

v.

Robert SARVER, Commissioner of Corrections, Respondent.

George W. OVERTON et al., Petitioners,

v.

Robert SARVER, Commissioner of Corrections, Respondent.

Nos. PB–69–C–24, 69–C–25 and 69–C–29.

United States District Court
E. D. Arkansas,
Pine Bluff Division.

June 20, 1969.

Steele Hays and Jerry D. Jackson, Little Rock, Ark., for petitioners.

Don Langston, Deputy Atty. Gen., and Mike Wilson, Asst. Atty. Gen., State of Arkansas, Little Rock, Ark., for respondent.

Memorandum Opinion

HENLEY, Chief Judge.

The several petitioners in subject cases are inmates of the Cummins Farm Unit of the Arkansas State Penitentiary located in Lincoln County, Arkansas, some miles south of the City of Pine Bluff and near the towns of Grady, Gould, and Dumas. Petitioners complain that those in charge of the Farm are depriving them of rights protected by the Fourteenth Amendment to the Constitution of the United States. Federal jurisdiction under 28 U.S.C.A. § 1343(3) and 42 U.S.C.A. § 1983, is not questioned and is established. Under those sections the Court is authorized to grant both declaratory and injunctive relief to the extent that petitioners may have shown that they are entitled to relief.

The principal complaints of petitioners are that confinement in cells in the isolation unit of the Farm amounts to cruel and unusual punishment prohibited by the Eighth Amendment as carried forward into the Fourteenth, Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758; Jackson v. Bishop, 8 Cir., 404 F.2d 571, reversing Jackson v. Bishop, E.D.Ark., 268 F.Supp. 804; Talley v. Stephens, E.D.Ark., 247 F. Supp. 683; that they are denied adequate medical attention, Talley v. Stephens, supra; and that the Penitentiary authorities have failed to take adequate steps to protect inmates from assaults by other inmates, Cf. Johnson v. United States Government, E.D.Va., 258 F. Supp. 372, and Cohen v. United States, N.D.Ga., 252 F.Supp. 679.

Respondent, Robert Sarver, is the Commissioner of Corrections of the State of Arkansas, having been named to that position in November 1968. Mr. Sarver is the administrative head of the Cummins Farm Unit and also of the much smaller Tucker Farm Unit located some miles from Cummins; the Tucker Farm is in Jefferson County and is located near the town of England. Mr. Sarver serves under the Arkansas State Board of Corrections, an agency in the Executive Branch of the State government which was created by the Legislature in 1967. Respondent, who is represented by the Attorney General of Ar-

kansas, denies that the petitions have merit and asks that they be dismissed.

The petitions were submitted by the inmates pro se. The Court permitted them to be filed and prosecuted as class actions in forma pauperis and consolidated them for hearing. The Court appointed Mr. Steele Hays of Little Rock, an experienced and capable trial attorney, to represent petitioners without charge.

Mr. Hays accepted the appointment. He and one of his associates, Mr. Jerry Jackson, without expectation of compensation or reimbursement, proceeded to the Farm where they interviewed petitioners and others and took photographs of the facilities. Both Mr. Hays and Mr. Jackson vigorously represented petitioners at the rather extended hearing which consumed two full trial days and part of one night. The Court is most grateful to Messrs. Hays and Jackson for their services.

The three cases, hereinafter referred to collectively as though they were a single case, have been submitted on oral testimony, photographs, documentary evidence, and memorandum briefs. This opinion incorporates the Court's findings of fact and conclusions of law.

## I.

At this juncture it may be noted that the Court's inquiry here is limited to whether Arkansas convicts as a class, or individual convicts, have been and are being deprived of federal constitutional rights. The Court is not concerned in general with prison policies, administration, or discipline. However, if the State, acting through its penal authorities, is depriving convicts of rights which the Constitution protects, including the right to be free from cruel and unusual punishment, the Court may and should intervene to protect those rights and to put an end to unconstitutional practices. Courtney v. Bishop, 8 Cir., 409 F.2d 1185; Jackson v. Bishop, supra; Talley v. Stephens, supra.

The opinion of the Court of Appeals in Jackson v. Bishop, supra, makes clear that the concept of "cruel and unusual punishment" is a flexible and expanding one, and that a punishment or system of punishment is unconstitutional if it offends concepts of decency and human dignity and precepts of civilization which Americans profess to possess, or if it is disproportionate to the offense, or if it violates fundamental standards of good conscience and fairness. 404 F.2d at 577–579.

Solitary confinement or close confinement in an isolation unit of a prison is not unconstitutional per se, but depending on the circumstances it may be. Courtney v. Bishop, supra; Graham v. Willingham, 10 Cir., 384 F.2d 367; Kostal v. Tinsley, 10 Cir., 337 F.2d 845; Jordan v. Fitzharris, N.D.Cal., 257 F. Supp. 674.

In Jordan the Court held that solitary confinement in "slit cells" in a California correctional institution was in the circumstances shown by the evidence unconstitutional. It was said, 257 F.Supp. at 680, that the prison authorities had "abandoned elemental concepts of decency by permitting conditions to prevail of a shocking and debased nature" to the extent that the Court was required promptly to intervene "to restore the primal rules of a civilized community in accord with the mandate of the Constitution of the United States."

It is plain, then, that the State must refrain from imposing cruel and unusual punishments on its convicts. And the Court is convinced that the State owes to those whom it has deprived of their liberty an even more fundamental constitutional duty to use ordinary care to protect their lives and safety while in prison. The Government owes that duty to federal prisoners, Johnson v. United States Government and Cohen v. United States, both supra; and the Court thinks that a State prisoner is entitled to the same measure of care from the State, although the State, of course, is not an insurer of the safety of its convicts.

■ Where an unconstitutional situation is found to exist in a given prison, the prison authorities cannot escape responsibility for it by merely pointing to the existence of the same situation in other prisons, or by establishing that conditions in their prison are "better" or "no worse than" conditions prevailing elsewhere.

■ The record in this case is voluminous and covers a number of areas of prison life. The burden is upon the petitioners to show by a preponderance of the evidence that their constitutional rights and those of other inmates similarly situated have been violated, and that they are entitled to equitable relief with respect to the alleged violations.

The Court has considered the entire record in the light of the principles heretofore mentioned. The Court thinks it desirable to state at this point its ultimate findings and conclusions and to discuss some of them in detail at later points in the opinion.

■ Plaintiffs have failed to sustain their burden of proof with respect to the medical and dental facilities. While those facilities leave a good deal to be desired, the Court does not consider that the deficiencies are such as to raise a constitutional problem.

■ Plaintiffs have also failed to sustain their complaint about food served to prisoners while in isolation. As will be seen, the food is not appetizing; it is not intended to be, and the Constitution does not require that prisoners in isolation be served tasty or attractive dishes.

■ The Court heard some evidence as to alleged assaults on certain prisoners by prison employees and trusty guards. The Court does not think that evidence sufficient to justify relief in this case. Respondent and his subordinates are already forbidden by the injunction issued in the Jackson case from inflicting corporal punishment on convicts, and the Court is not persuaded that that injunction has been violated.

The Court does find from a preponderance of the evidence that the State has failed and is failing to discharge its constitutional duty with respect to the safety of certain convicts, and that the conditions existing in the isolation cells, including overcrowding, render confinement in those cells under those conditions unconstitutional.

With respect to the areas in which unconstitutionalities are found to exist, there is persuasive evidence that when a new maximum security unit is completed and put into operation in the next year or so the Farm's problems of inmate safety and confinement in isolation will be much ameliorated if not eliminated entirely. However, the Court is persuaded that present inmates are entitled to some injunctive relief in those areas at this time.

## II.

The history of Cummins Farm, which consists of more than 15,000 acres, and which has a present inmate population of something less than 1,000, has two phases.

The first phase lasted for years and did not come to an end until January 1968. During that long period of time there were extremely few paid "free world" employees at the Farm. Prisoners were guarded by armed trusties, and those trusties and other inmates referred to for some reason as "dopops" exercised a great deal of authority and control over other inmates. In fact, it may be said accurately that the institution was being run in large measure by inmates.

Using free convict labor, both Cummins Farm and Tucker Farm produced field crops and other agricultural commodities which were sold on the market, and the income from those sales was generally sufficient, or was supposed to be sufficient to cover the limited operating costs of the Farms, and it was frequently, though inaccurately, said that the State was operating the Farms at a profit, a fact to which successive State administrations pointed with pride.

Prior to the appointment of Thomas O. Murton as Superintendent of the Penitentiary in 1967 inmates of the Penitentiary were disciplined by the use of a large leather strap, and were not generally punished in any other way except by forfeitures of good time in the event of escapes. Prisoners were whipped for rule violations, refusal to work, escapes, and failure to perform sufficient or satisfactory work. A prisoner who escaped and was recaptured was whipped and had his head shaved; additionally, he lost his statutory good time and might be faced with a new criminal charge based on the escape.

In 1965 and again in 1967 the United States District Court for the Eastern District of Arkansas issued limited injunctions against the unregulated or insufficiently regulated use of corporal punishment at the Penitentiary. Talley v. Stephens, supra; Jackson v. Bishop, supra, 268 F.Supp. 804. However, neither this writer nor Judges Gordon E. Young and Oren Harris were willing to hold corporal punishment unconstitutional per se.

When the District Court in Jackson v. Bishop refused to enjoin outright the use of the strap, the petitioners in that case appealed. While the appeal was pending, Mr. Murton was made Superintendent of the Penitentiary, and he discontinued the practice administratively. The Court of Appeals, however, declined to consider the question moot, and held that corporal punishment is unconstitutional, regardless of its severity and regardless of the conditions under which it is imposed or of the safeguards with which it is surrounded. Jackson v. Bishop, supra, 404 F.2d 571.

The second phase of the history of the Farm has been characterized not only by a cessation of whipping, which has been superseded by confinement in isolation, but also by the employment of an increasing number of free world employees. There have been marked improvements at the Farm and additional improvements, including the new maximum security unit, are to be expected.

However, it appears to the Court that the Farm is still in a transitional period, and much of the old regime is still visible. Convicts still work long hours in the fields and in institutional facilities; they are paid nothing, either actually or constructively, for their labor; they have few privileges and few incentives to be cooperative, rules-observing members of the prison community. They are still guarded principally by armed trusties, and the ordinary convicts, known as "rankers," are still subject in some degree to the authority of trusties and "dopops."

The only legitimate way in which a convict at Cummins can earn money is to sell blood to the prison blood bank. However, there are many illicit ways of earning money, and the convicts take full advantage of them. Trusties smuggle in contraband, including liquor and knives. A kind of home made beer is produced frequently on the Farm premises and is sold to and consumed by inmates of all grades.

Convicts are not permitted to have United States currency and coins in their physical possession since an inmate with money in his pocket is more likely to attempt to escape and more likely to escape successfully than an inmate who is penniless. In order to have a medium of exchange for such legitimate business transactions as take place within the institution prisoners with money to their credit on the prison books are issued small metal coins in denominations of five and ten cents, which "money" is known as "brozine." If a convict is found with "free world money" on his person, that money is confiscated and put into an inmate welfare fund.

Apparently, the educational level attained by Farm inmates is quite low. Many of the inmates are psychopathic and sociopathic; some of them are aggressive homosexuals. Many of the inmates are hardened criminals and some of them are extremely dangerous to society in general, to their keepers, and to fellow inmates. Many of them are malingerers and will go to any lengths to

avoid work. Many are prone to destroy State property, even items designed for their welfare and comfort.

In view of what has been said it is obvious that Respondent and his subordinates at Cummins are faced with grave problems of security and discipline. In grappling with those problems, and with others, Respondent is severely hampered by lack of money.

That lack is due in part to the historical concept of the Farm as a self-sustaining or profit-making institution which should not require appropriations of large sums of State money. It is also due in part to an understandable reluctance on the part of those in charge of the revenues and disbursements of the State to spend large sums on prisons while other agencies and institutions providing services for law abiding people are under-funded.

In the circumstances Respondent must perforce still rely rather heavily on inmates to perform functions which in most prisons are performed by free world people. And continued reliance on inmates assumes that if the trusty guard system as it exists at the Farm is attacked in the courts, it will survive the attack.

This case does not involve such an attack, although, as stated, there was some evidence about alleged trusty brutality. No one questions the propriety of granting trusty status to dependable convicts and permitting them to perform certain services. The services may be valuable in themselves, and they can certainly be of value in improving inmate morale and aiding rehabilitation. A serious question can be raised, however, as to the constitutionality of the system at Cummins where inadequately supervised trusties, many of whom are hardened criminals, are permitted to guard and exercise authority over other inmates some of whom are less evil and dangerous than the trusties themselves.

If the system is attacked and does not survive, the services now performed by trusty guards will have to be performed by outside people who will have to be paid for their services.

### III.

With the foregoing by way of background, the Court turns to the question of inmate safety.

The Superintendent at Cummins is Ralph Roberts, and the Associate Superintendent is J. R. Price, both of whom appear to be competent men. The Chief Security Officer is Ed Walker, and he has 17 free world armed guards working under him. In addition, a member of the Arkansas State Police is regularly stationed at Cummins. The total number of paid employees at the Farm is 56.

Prisoners who are not confined in the isolation unit sleep in open barracks. There are two barracks for trusties and two for "dopops" and rankers. Those barracks amount to enclosed dormitories in which the inmates sleep on cots arranged in rows. At night there are one or more free world guards on duty outside the barracks proper, but they are not actually inside the sleeping area. Those areas are supposedly patrolled by inmate "floorwalkers" whose duty it is to report disturbances to the guards.

Since the inmates sleep together in the barracks, an inmate has ready access to any other inmate sleeping in the same barracks. Many of the inmates have weapons of one sort or another, and the evidence indicates that in spite of efforts to do so it is impossible from a practical standpoint to prevent inmates from having small weapons such as knives or scissors in their possession.

At times deadly feuds arise between particular inmates, and if one of them can catch his enemy asleep it is easy to crawl over and stab him. Inmates who commit such assaults are known as "crawlers" and "creepers," and other inmates live in fear of them. The Court finds that the "floorwalkers" are ineffective in preventing such assaults; they are either afraid to call the guards or, in instances, may be in league with the assailants.

The undisputed evidence is to the effect that within the last 18 months there have been 17 stabbings at Cummins, all but one of them taking place in the barracks, and four of them producing fatal results. At least two of the petitioners now in isolation have been assailants in stabbing incidents and others have been the victims of such incidents.

Respondent and his subordinates deplore the situation just described but insist that until the maximum security unit can be put into use there is nothing that they can do about it. Respondent testified that when he was the head of a penitentiary in another State convicts there slept in individual cells and there were 170 paid guards; he also testified that the incidence of stabbings at Cummins was no higher than that at the other institution he had headed. He conceded, however, that more free world guards at Cummins might ameliorate the situation somewhat.

The Court recognizes, of course, that assaults, fights, stabbings, and killings may and do occur in penal institutions that are unquestionably well equipped, well staffed, and well managed. It occurs to the Court, however, that such incidents in such institutions take place in spite of all reasonable precautions taken by prison authorities. At Cummins there are no precautions worthy of the name, and the "creepers" and "crawlers" take deadly advantage of that fact.

The Court is of the view that if the State of Arkansas chooses to confine penitentiary inmates in barracks with other inmates, they ought at least to be able to fall asleep at night without fear of having their throats cut before morning, and that the State has failed to discharge a constitutional duty in failing to take steps to enable them to do so.

### IV.

The isolation unit at Cummins consists of a one-story concrete block building surrounded by a tall metal fence. Inside that building are 12 cells arranged in a single row on one side of the building. Eleven of those cells are used to confine inmates; the other has been fitted up as a shower room. The building is heated by gas, and there are blowers to provide ventilation. In hot weather the exterior door or doors of the building are left open to provide circulation.

The building has no windows; however, electric lights are burned so that the inmates are not confined in darkness during daylight hours. The fronts of the individual cells are closed in part by concrete walls and for the rest by solid metal doors. At the bottom of each door is a small movable grating through which food trays are pushed and later recovered.

The individual cells are ten feet long by approximately eight feet wide; the record does not reflect how high they are, but photographs indicate that the distance from floor to ceiling substantially exceeds the height of a man. The cells are completely bare of furniture, probably due to the tendency of inmates to tear up pieces of furniture that might be put in the cells. Each cell contains a drinking fountain, and each is equipped with a concrete toilet. An examination of the photographs makes it rather clear that while the toilets will flush, they cannot be flushed by a person inside the cell. It is not clear whether the toilets can be covered firmly so as to hold down odors; the photographs suggest that some of them are covered with pieces of tarpaulin or other material.

There seem to be three classes of inmates in the isolation cells: (1) Prisoners confined in isolation for rule infractions; (2) Prisoners held in the cells as a measure of "protective custody," the purpose of which is to protect them from other inmates; (3) Prisoners who are general escape or security risks or who are awaiting trial on additional criminal charges.

Theoretically, a prisoner is not committed to isolation for a rule infraction until he has been found guilty by the administrative court described in the evidence. In practice, however, a prisoner

may be put in the unit before hearing and may stay there for several days prior to hearing. An infraction of rules usually produces a sentence of a definite number of days, and some of the sentences are for rather long periods. Common rule infractions resulting in confinement in the unit are insubordination, fighting, and refusing to work, and it appears that some prisoners deliberately refuse to work or temporarily disable themselves to avoid work.

An inmate of the Farm may be put into the unit for protective custody if he requests that action provided that the Penitentiary authorities think that he needs protection. Protective custody confinements are usually of indefinite duration.

■■ Inmates in protective custody usually are sent to their regular work each day and are served regular prison food. Inmates who are kept in the unit 24 hours a day are served a food mixture known as "grue." "Grue" consists of meat, potatoes, vegetables, eggs, oleo, syrup, and seasoning baked all together in a pan and served in four inch squares. The Court finds that while "grue" is not appetizing and is not served attractively, it is a wholesome and sufficient diet for men in close confinement day after day. The Court observed all of the petitioners, and none of them appeared to be suffering from malnutrition.

The "grue" is delivered at the isolation unit on plates or trays and is pushed to the inmates through the gratings at the bottoms of the doors. At times portions of the food are knocked off of the plates as they are pushed through the gratings. There is some evidence that at times trays of food are left on the ground outside the unit, and that in instances the food has been tainted by dogs or birds. However, the Court is convinced that such instances have been rare if they have occurred at all.

The Court finds that the isolation cells are dirty and unsanitary, that they are pervaded by bad odors from the toilets, and that the plain cotton mattresses on which the inmates sleep are uncovered and dirty. Those conditions are due at least in part to the fact that the inmates take little or no interest in keeping their cells clean and in part to the overcrowded conditions of the cells presently to be described.

Confinement in the isolation cells is not "solitary confinement" in the conventional sense of that term. On the contrary, the cells are substantially overcrowded. As of the time of the hearing only two of the cells were occupied by one man only, and they were so occupied only because of the fact that the two individuals confined therein are too dangerous to be put with other prisoners. The average number of men confined in a single cell seems to be four, but at times the number has been much higher. In extreme circumstances as many as ten or eleven men have been in the same cell at the same time.

As stated, inmates of the isolation unit sleep on mattresses which are spread on the cell floors. During daylight hours the mattresses are removed from the cells of the men who are required to remain in the cells 24 hours a day. The mattresses of the "protective custody" inmates who work remain in the cells all day. The mattresses that are removed from the cells are piled indiscriminately in the corridor of the unit and are indiscriminately returned to the inmates at night. Thus an inmate has no assurance that the mattress alloted to him on any night is the same one that he had the night before or the same one that he will have the next night. That problem is aggravated by the fact that some of the inmates of the cells suffer from infectious diseases. In that connection the evidence discloses that one inmate died recently in the infirmary of infectious hepatitis after having been confined in isolation for a number of days. And one of the petitioners who is in the same cell as other men testified that he is suffering from venereal disease. It should

be said, however, that there is no evidence that any inmate has as yet contracted a serious contagious disease from another inmate.

Theoretically, inmates are permitted to take showers twice a week. In practice, that schedule is not adhered to consistently, and it is possible that individual inmates may not avail themselves of an opportunity to shower.

Inmates of the cells who are there for purposes of discipline are not permitted to exercise outside their cells. Prior to May 28 the same rule applied to inmates in protective custody who did not work; the Court understands, however, that since that date such inmates have been allowed reasonable exercise. The inmates who work get exercise, of course, while they are at their daily tasks.

Without undertaking to state with specificity the exact point at which one of the isolation cells becomes "overcrowded" rather than simply "crowded," and two men are a crowd in an 8 x 10 cell when they have to stay there 24 hours a day for days or weeks on end, the Court finds that the cells have been chronically overcrowded, and that overcrowding to a greater or lesser extent will unavoidably continue until such time as more isolation cells are available.

In evaluating from a constitutional standpoint confinement in isolation as practiced at Cummins, the Court will observe that it does not find that any of the present inmates of the isolation were put there unnecessarily, unjustly, arbitrarily, or discriminatorily. The inmates of the unit who are there for discipline have deserved their punishment. Those who are there for the protection of themselves and other inmates should be kept away from the general prison population.

Confinement in isolation is now the only stringent disciplinary measure available at Cummins since the Court of Appeals has enjoined the use of the strap. If confinement of that type is to serve any useful purpose, it must be rigorous, uncomfortable, and unpleasant.

However, there are limits to the rigor and discomfort of close confinement which a State may not constitutionally exceed, and the Court finds that those limits have been exceeded here. The Court finds that the prolonged confinement of numbers of men in the same cell under the conditions that have been described is mentally and emotionally traumatic as well as physically uncomfortable. It is hazardous to health. It is degrading and debasing; it offends modern sensibilities, and, in the Court's estimation, amounts to cruel and unusual punishment.

### V.

The task of the Court in devising a remedy in this case is both difficult and delicate.

Subject to constitutional limitations, Arkansas is a sovereign State. It has a right to make and enforce criminal laws, to imprison persons convicted of serious crimes, and to maintain order and discipline in its prisons. This Court has no intention of entering a decree herein that will disrupt the Penitentiary or leave Respondent and his subordinates helpless to deal with dangerous and unruly convicts.

The Court has recognized heretofore the financial handicaps under which the Penitentiary system is laboring, and the Court knows that Respondent cannot make bricks without straw.

However, the Court is convinced that given the will Respondent with the means now available to him and that will become available to him at the commencement of the new fiscal year that begins on July 1 can make a substantial start toward alleviating the conditions that the Court has found to be unconstitutional. He will be ordered to do so.

The Court will not undertake at this time to prescribe any specific immediate steps to be taken by Respondent. The Court would like to know first what Respondent thinks that he can do, and what he is willing to undertake to do. There are some suggestions that the Court is prepared to make.

First, in allocating funds and assigning free world personnel to duties, Respondent should give the highest priority to the safety of inmates of the barracks and to alleviating existing conditions in the isolation unit. If that is done, Respondent may find that he can put free world guards into the barracks proper and dispense with the "floorwalkers." Although the Court recognizes that it might be unwise to spend a large amount of money on temporary facilities in view of the contemplated construction of the new maximum security unit, Respondent may also find that he will be able to build some additional isolation cells.

Second, there is evidence to the effect that some inmates are more of a problem at one farm than they are at the other. Consideration might be given to transferring certain individual inmates from Cummins to Tucker.

Third, every effort should be made to hold the number of persons confined in a single isolation cell at one time to a minimum. That may involve more selectivity in imposing isolation as a punishment, or shorter sentences, or more flexible sentences. In the field of criminology it has been observed that long terms of imprisonment imposed on persons convicted of crime are not necessarily more efficacious as crime deterrents than shorter sentences, and the same thing may hold good within the walls of penal institutions.

Fourth, in ordinary cases inmates should not be long confined in isolation in advance of hearing, and consideration might be given to an automatic review of the actions of all sentencing panels.

Finally, Respondent ought to be able at minimum expense to do something about the sanitary conditions of the cells and he might give consideration to doing so without much regard to the attitudes of the inmates. Certainly, something can be done about the condition of the mattresses and it can be assured at least that an inmate will sleep on the same mattress every night. Most important,

seriously ill men should not be confined in close contact with other prisoners.

The foregoing suggestions happen to be those that occur to the Court at the moment; the Court does not suggest that they are necessarily all of the steps that can and should be taken.

In the decree to be entered Respondent will be directed to report to the Court within 30 days as to what steps he in fact plans to take, and jurisdiction of the case will be retained for all appropriate purposes.