**Clinton Martin FLEISHOUR, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 62 C 2270.

United States District Court
N. D. Illinois, E. D.

Aug. 26, 1965.

Elmer Gertz, Chicago, Ill., for plaintiff.

Edward V. Hanrahan, U. S. Atty., Thomas W. James, Asst. U. S. Atty., Chicago, Ill., J. Charles Kruse, Trial Atty., Dept. of Justice, Washington, D. C., for defendant.

WILL, District Judge.

This cause having come on for hearing before the Court on Count One, the issue of liability only, and the Court having examined the pleadings and the stipulation of facts submitted, having heard evidence and the statements of counsel, having examined the documents submitted as exhibits [1], and being fully ad-

**22.** Larios v. Victory Carriers, Inc., supra, 316 F.2d at 63.

**1.** Exhibits D, E, F, G and H have been admitted into evidence by the Court. The other proposed exhibits antedate the events herein considered and are irrelevant and immaterial.

vised, now enters the following findings of fact and conclusions of law and files its opinion.

## Findings of Fact

1. This is an action for money damages for personal injuries which the plaintiff alleges arose out of an incident that occurred during the night of December 15–16, 1960, at McNeil Island, Washington, a federal penitentiary operated by the Bureau of Prisons, an agency of the United States.

2. On December 15–16, 1960, the plaintiff, then 21 years old, was a federal prisoner confined at McNeil Island Penitentiary. Troy Lee Stringfellow, then 19 years old, was similarly confined therein.

3. The plaintiff and Stringfellow were transferred to McNeil Island from the Federal Correctional Institution at Lompoc, California, an institution maintained for the incarceration of youthful offenders, on December 13, 1960. They were two of a group of over thirty inmates transferred from Lompoc to McNeil Island, a transfer prompted by a decision by Bureau of Prisons officials who had found the individuals in the group to be problem inmates unable to adjust to the less structured environment of the California facility.

4. Both the plaintiff and Stringfellow had prison records prior to commencing the terms they were serving at the time of the incident which gives rise to this action. The plaintiff was made a ward of the Juvenile Court of Honolulu, Hawaii, in 1955, when he was arrested for breaking and entering. He was in federal custody from 1957 to 1959 for violation of the Dyer Act, 18 U.S.C. § 2312, initially at the Federal Reformatory, El Reno, Oklahoma, then at the Federal Correctional Institution, Terminal Island, California, and finally at Lompoc. He was conditionally released on December 4, 1959, and paroled in January, 1960. He was convicted on a second Dyer Act charge on March 21, 1960, and again sent to Lompoc.

5. Troy Lee Stringfellow's criminal record dates back to January, 1958, when he was arrested in California. He ad- mitted several burglaries and attempted burglaries. The Juvenile Court placed him in a Boys' School, where he spent seven months before being paroled in July, 1958. He was arrested for violation of the Dyer Act on August 7, 1959, and, upon conviction, incarcerated at Lompoc.

6. While at Lompoc, Stringfellow received nine misconduct reports. On November 10, 1960, upon review by the Classification Committee at the prison (a body composed of Associate Wardens, the individual's caseworker, and the Chief of Classification at the Institution) the decision was made to recommend his transfer to McNeil Island. The Bureau of Prisons in Washington, D.C., concurred and on December 7, 1960, an order of transfer was sent to the Warden at Lompoc.

7. On December 13, 1960, the plaintiff, Stringfellow, and about 30 other prisoners were transferred from Lompoc to McNeil Island. All of them were assigned to the Admissions & Orientation Unit, where incoming prisoners are customarily housed until they are assigned to a specific program within the institution. All of the individuals in the group of transferees from Lompoc were interviewed individually by the Associate Wardens and Custodial Supervisors immediately upon arrival. Each prisoner's dossier went with him to McNeil Island and the records of all the prisoners were available to the Bureau of Prisons officials at the prison as soon as they arrived.

8. From the time the prisoners arrived at McNeil Island on December 13 until the night of the assault, December 15–16, they remained in the Admissions & Orientation Building. The area in which the inmates slept has a dormitory room with two rows of beds on the first floor. Each of the three floors above the dormitory room has a cell block containing 20 individual cells, making a total of 60 one-man cells on the three floors. The inmates in the Admissions & Orientation Unit are kept in the individual cells rather than in the dormitory room when possible. Plaintiff was in an individual

cell on December 13 and 14. There is no information as to whether Stringfellow was in an individual cell on those nights. On December 15–16 the number of prisoners in the Admissions & Orientation Unit substantially exceeded the number of individual cells and those inmates for whom there were no individual cells, approximately 40, including Fleishour and Stringfellow, were assigned to the dormitory room for the night.

9. At 2:30 A. M. on December 16, 1960, Stringfellow assaulted the sleeping Fleishour by hitting him on the head with a tank type fire extinguisher which was situated in the dormitory.

10. The Bureau of Prisons employee in charge of the Admissions & Orientation Unit from 12:15 A. M. to 8:15 A. M., December 16, was Senior Correctional Officer Claude O. Connell. Officer Connell had responsibility for the supervision of the cell blocks on the upper three floors and the dormitory.

11. At the time of the assault Officer Connell was at his station in the Admissions & Orientation Unit on the floor above the dormitory where he was sorting mail. The officer's station consisted of a desk in the corridor of the stairway which ran from the dormitory room to the three floors of cell blocks. He heard a noise and checked his immediate surroundings on A tier. Upon hearing the noise again he immediately went to the floor below to investigate. When he entered the large dormitory he found an inmate, one Aldridge, holding Stringfellow, who was trying desperately to take off a pair of prison-issue socks which he was wearing on his hands. Officer Connell inquired as to what had occurred and then heard a moan to his left. There, he found the plaintiff lying on the floor, his head, back, and shoulders covered with blood.

12. Officer Connell immediately called his superior, Lieutenant Victor N. Downing, who was in the Control Center, a building next to the Admissions and Orientation Unit. Connell then returned to the inmates. He asked Stringfellow what he had used to strike Fleishour, but Stringfellow did not answer. Inmate Aldridge informed the officer that Stringfellow had hit Fleishour with a fire extinguisher, which Aldridge then pointed out and which was bloody. As Fleishour was removed to the hospital, Stringfellow was taken out of the dormitory. Upon being asked if he had used the fire extinguisher to hit Fleishour, Stringfellow admitted his act.

### Conclusions of Law

1. This Court has jurisdiction over the instant action, the exceptions to Federal Tort Claims Act suits found in 28 U.S.C. §§ 2680(a) and 2680(h) not being dispositive of all allegations set out in the complaint.

2. The officials charged with maintenance of the United States Penitentiary at McNeil Island, Washington, carried out their duties with reasonable care under all the circumstances and therefore without negligence toward the plaintiff.

3. The United States is therefore not liable to him under the Federal Tort Claims Act for any damages sustained as a result of the occurrence which is the basis of this case.

### Opinion

This action for damages is brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 et seq. The defendant challenges the jurisdiction of the court on three grounds:

1) The suit is barred by 28 U.S.C. § 2680(h) which bars "[a]ny claim arising out of assault [or] battery."

2) The suit is barred by that part of 28 U.S.C. § 2680(a) which bars "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation."

3) The suit is barred by that part of 28 U.S.C. § 2680(a) which bars any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty."

### 1. THE SECTION 2680(h) DEFENSE

The government urges that because the acts here complained of arose out of

an assault and battery, the instant case falls under the exception to the Federal Torts Claims Act stated in 28 U.S.C. § 2680(h). In support of this position, it cites a host of cases. In each one, however, the assault and/or battery inflicted upon the complaining party came at the hand of a government employee or his agent: United States v. Hambleton, 185 F.2d 564, 23 A.L.R.2d 568 (9 Cir. 1950) (mental suffering resulting from interrogation by sergeant from Army Criminal Investigation Division); Lewis v. United States, 194 F.2d 689 (3 Cir. 1951) (injury inflicted by army sentry on duty when plaintiff failed to obey orders to halt at gate); Stepp v. United States, 207 F.2d 909 (4 Cir. 1953), cert. denied 347 U.S. 933, 74 S.Ct. 627, 98 L.Ed. 1084 (1954) (civilian seaman shot by army guard on duty at dock upon refusal of seaman to stop for search); Jones v. United States, 249 F.2d 864 (7 Cir. 1957) (injury caused by heavy labor and inadequate medical attention while federal prisoner) [2]; Alaniz v. United States, 257 F.2d 108 (10 Cir. 1958) (shooting by F.B.I.-appointed agent [a deputy sheriff] while agent was seeking to apprehend thief); Hall v. United States, 274 F.2d 69 (10 Cir. 1959) (negligent performance of tests by Department of Agriculture inspectors which resulted in plaintiff selling cattle at a price below actual value); Klein v. United States, 268 F.2d 63 (2 Cir. 1959) (exposure to elements and subjection to mental indignity by Customs Officers and Agents of the F.B.I.); United States v. Neustadt, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961) (misrepresentation of property value by Federal Housing Administration appraiser); United States v. Faneca, 332 F.2d 872 (5 Cir. 1964), cert. denied 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1965) (plaintiff fired at by United States marshals during efforts to carry out court order);

Richardson v. United States, 226 F.Supp. 49 (E.D.Va.1964) (Marine officer injured by enlisted man as former assisted latter in leaving officers' club).

The best analysis of a situation analogous to the one at bar, where the battery is not administered by a government employee but by a third party, is Mr. Justice, then Judge, Harlan's opinion in Panella v. United States, 216 F.2d 622 (2 Cir. 1954):

"It is true that Section 2680(h), retaining immunity against claims arising out of assault and battery, can literally be read to apply to assaults committed by persons other than government employees. But we think such a construction out of keeping with the rest of the act. For in the present case the only basis of liability against the government is the negligence of its employees, not their deliberate torts, since the assailant was not a Government employee. Unless it can be shown that government employees were negligent in maintaining the internal security of the Hospital, no liability could be imposed under the Tort Claims Act for the alleged assault, even if § 2680(h) did not exist, and the Government had thus waived immunity for claims arising out of assault. It is therefore important to distinguish cases in which it was sought to hold the Government liable on a negligence theory for assaults committed by *government employees*." At 624. (Emphasis in text.)

Although mentioning Panella only in passing [3], the Supreme Court adopted the reasoning employed by the Second Circuit in that case in United States v. Muniz, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). Muniz alleged that he

---

2. Little, if any, life remains in the Jones case. In United States v. Muniz, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963), discussed in text accompanying note 3, infra, the Supreme Court specifically rejected the holding in Jones, 374 U.S. at 153, 83 S.Ct. at 1852.

3. The lower court in Muniz v. United States, 305 F.2d 285 (2 Cir. 1962), ruled that the § 2680(h) exemption was inapplicable, distinguishing between assaults by government agents and assaults by third parties and citing Panella.

was struck by another prisoner in the federal institution at Danbury, Connecticut. The guard on the scene locked the dormitory into which Muniz was chased by his assailant and other inmates. While inside the dormitory Muniz was beaten by his tormentors. His right to bring an action against the United States was upheld by the Supreme Court: "None of the exceptions [to Section 2680] precludes suit against the Government by federal prisoners for injuries sustained in prison. So far as it appears from the face of the Act, Congress has clearly consented to suits such as those involved in the case at bar. Whether a claim could be made out would depend upon whether a private individual under like circumstances would be liable under state law, but prisoners are at least not prohibited from suing." 374 U.S. at 153, 83 S.Ct. at 1853.

█ From the above, it follows that Fleishour is not barred from this court by the exception to the Federal Tort Claims Act found in Section 2680(h).

2. THE SECTION 2680(a) DEFENSES

The two challenges to the Court's jurisdiction under Section 2680(a), referring to acts and omissions in the execution of a statute or regulation and to discretionary functions are closely related and may be discussed together. In essence, the United States claims that a series of decisions made by the Bureau of Prisons and acted upon by employees of that agency may not be challenged in the courts, e. g., the decision to transfer Stringfellow from Lompoc to McNeil Island rather than to a hospital institution such as the medical center at Springfield, Missouri, the decision to house newly-arrived prisoners in a dormitory type arrangement without reference to their individual records and other decisions which may be categorized as being at the "planning level" or as "policy making". The government's position, as it refers to decisions made in the discretion of policy makers, is consistent with the landmark case in this area, Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), which holds that decisions

made at a planning rather than operational level may not be the subject of court suits.

The complaint in the instant case, however, addresses itself to more than high level policy decisions. At page 5, it is stated that "the said unit was unguarded and without any supervision of any kind, and in any event, while there was inadequate supervision and custody, and while fire extinguishers and other lethal and dangerous articles were left unguarded in the said room, the defendant, Troy Lee Stringfellow, assaulted the plaintiff, without reasonable or any provocation, while the plaintiff was asleep at night, with a fire extinguisher * * *." It is further alleged, at page 7, that the government "did not provide adequate custody or protection to the said unit, and the officer ostensibly in charge thereof was not in the unit at the time of the acts complained of, but in another unit." These allegations put the instant action in the posture of the Muniz case, supra, in which the plaintiff alleged "that the prison officials were negligent in failing to provide enough guards to prevent the assaults leading to his injuries and in letting prisoners, some of whom were mentally abnormal, intermingle without adequate supervision." 374 U.S. at 152, 83 S.Ct. at 1852.

█ From the Supreme Court's holding in Muniz that a prisoner may sue under the Federal Torts Claims Act to recover damages allegedly resulting from the negligence of a prison official, it appears that the actions of such government employees are at what the Court in Dalehite, supra, conceived to be the "operational level" and thus actionable. Hence, the Section 2680(a) exemption is not available to the defendant under the facts of this case and this court has jurisdiction over the matter.

3. THE DEFENSE OF NO NEGLIGENCE

█ Having determined that this Court has jurisdiction over the instant case, we now turn to the merits. The liability of the United States is dependent

upon "whether a private individual under like circumstances should be liable under state law." Muniz, supra, at 153, 83 S. Ct. at 1853. The State of Washington does not hold a person liable without proof of negligence. United States v. Coffey, 233 F.2d 41 (9 Cir. 1956). The significant question then becomes, "did the agents of the United States act or fail to act as reasonable persons would under all the circumstances?"

Plaintiff asserts that they were negligent in "the placing of a dangerous mental defective in an open, unguarded prison dormitory with a large number of inmates where dangerous objects are left lying about  *  *  *."

The evidence before the court indicates that while Stringfellow undoubtedly had aggressive tendencies, his record at Lompoc was not substantially different from that of the other transferees including plaintiff. All of them had been troublemakers and disciplinary problems at Lompoc which is why they were being transferred to McNeil.

Was it negligent to place approximately forty prisoners, including many with assaultive records, in a single dormitory room with no guard in the room and with various objects present, including fire extinguishers, which could be used as weapons? To a layman, the first and quick answer seems obviously "yes". It is only after all relevant factors are considered that the answer becomes less obvious.

A number of penologists of long and extensive experience in both the Federal and state prison systems testified that when prisoners are transferred from an institution where they have not made a satisfactory adjustment and have run into conflict with the guards and other authorities, it is accepted practice to give them an opportunity to make a fresh start at the transferee institution and not treat them as troublemakers unless they warrant it by their conduct at that institution. Accordingly, they expressed the opinion that the dormitory sleeping arrangements here involved were reasonable.

These same experts pointed out that all aspects of prison life which seek to encourage rehabilitation and responsible conduct by prisoners inevitably involve calculated risks. Most of those incarcerated have greater or lesser assaultive tendencies and the only certain way to insure against prison episodes is by complete isolation which is not only physically very difficult, if not impossible, but also least likely to induce positive attitudes in and the rehabilitation of persons so treated.

Accordingly, it is, we are told, standard practice in modern penal institutions to take calculated risks in various aspects of prison life, housing, work, recreation, religious worship and others, so that prisoners may learn to get along with other persons as part of the rehabilitation process. The result is, that from time to time, there occurs an episode such as that here involved in which the gamble is lost and another prisoner is injured.

It was the opinion of all the experts who testified that the officials at McNeil had acted reasonably and in a manner consistent with accepted prison practices at the time here involved. In the face of such testimony, the court cannot conclude that plaintiff has established by a preponderance of the evidence that these officials were negligent and judgment must therefore be entered for the defendant.

The court reaches this conclusion with some reluctance since it seems unfortunate that plaintiff who here may be euphemistically characterized as an "innocent bystander" should not be compensated for his injuries. Risk of serious physical damages or even death should not be an inherent and uncompensated element of every prison sentence. If the experts are correct that sound penology requires the taking of such calculated risks, some provision should be made to compensate a prisoner who, through no fault of his own and in the absence of negligence by prison officials, nevertheless is seriously injured.

This is not to suggest that the Government should become the insurer of the

physical well-being of every prisoner. But where, as here, a prisoner is attacked in his sleep with no provocation or other action on his part and the attacker has the opportunity to strike because it is desirable as a matter of broad penal policy to give it to him, the innocent and fortuitous victim, if not compensated, pays a far greater penalty than the sentence imposed upon him and that paid by others given the same term but luckily not injured during incarceration.

Our society has recognized that the taking of calculated risks is sometimes desirable or even necessary. With the use of all conceivable safety devices, our technological and industrial civilization still requires known risk taking. By and large, we have sought to compensate persons injured as a result of taking such risks even though the law generally precludes compensation for damages resulting from risks taken by the person injured. The Federal Employers' Liability Act, other federal laws as well as most state Workmen's Compensation Laws, exclude assumption of risk as a defense to a claim. The reasons are obvious and sound. We ask people to take risks in the interest of the entire community. If, as a result, they are injured, they should be compensated.

Similarly, we ask prisoners to take risks in the process of attempting to rehabilitate as many as possible, a result greatly in the community interest. If, as a consequence, one is injured through no fault of his own it seems unfortunate and unfair that he be made to accept his injuries as additional punishment. To date at least the law gives a prisoner so injured no right to compensation. In the opinion of one judge, at least, it should. As presented to the court, however, the facts are not such as to hold that, under the law of the State of Washington, the United States was negligent so as to be liable to the plaintiff in the instant case.

As previously indicated, the issue of liability on Count I is resolved in favor of the defendant. The other counts having been disposed of at an earlier date, the case is hereby dismissed. An appropriate order will be entered.