**Willie B. WILLIAMS, Jr., Plaintiff,**

**v.**

**The UNITED STATES of America, Defendant.**

**Civ. A. No. 572–73.**

United States District Court,
District of Columbia,
Civil Division.

Oct. 11, 1974.

William H. Roberge, Jr., Washington, D. C., for plaintiff.

Robert Dennis Batson, Justice Dept., Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

This suit was instituted by plaintiff Willie B. Williams pursuant to the provisions of the Federal Tort Claims Act, 28 U.S.C. Section 1346(b), for injuries received as a result of an assault by a fellow inmate, William Foster, on June 26, 1971. At the time of the assault plaintiff and Foster were inmates at the United States Penitentiary, Milan, Michigan. In the early morning hours of that date, approximately 5:00 a. m., plaintiff was assaulted by inmate Foster who doused plaintiff with a cup of gasoline and then ignited the flammable with a match.

Plaintiff's theory of negligence is that the prison officials at Milan failed to adequately provide for his safety and protection under the provisions of Section 4042 of Title 18, United States Code. Specifically, plaintiff alleges that defendant's employees were negligent in the following respects:

1. That the institutional officers were aware of hostilities existing between plaintiff Williams and the assailant Foster, and that said employees permitted the two inmates to remain in the same dormitory without restriction; and, that such inaction on the part of the federal officers directly resulted in the assault perpetrated on plaintiff by Foster.

2. That the institutional officers were negligent in permitting Foster to have access to a flammable liquid.

With respect to both allegations, the Government denied any acts of negligence or omission on the part of its employees and asserted that its correctional officers at all times exercised care consistent with standard penal practices in the keeping of both prisoners. In addition, the Government contended that plaintiff had, on occasions prior to the assault on June 26, attempted to pressure inmate Foster into participating in homosexual acts with Williams; that Foster resisted such advances by Williams; that on Friday morning, June 25, Williams assaulted Foster, and that as a result of such assault and physical threats to Foster's life and body, Williams in fact intimidated and coerced Foster into participating in a sex act; and that in retaliation to Williams' sexual attack, Foster

assaulted Williams in his sleep on the morning of June 26, 1971. Defendant argued that Foster's retaliation was a most foreseeable consequence of Williams' aggressive and provocative activities, and that any injury incurred as a result of his assaultive behavior was a proximate and contributing factor to his injury and should thereby preclude any recovery by plaintiff.

After hearing the testimony of the parties and examining the exhibits, the Court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. The Federal Correctional Institution at Milan, Michigan is a medium security prison with a program especially created to meet the needs of youthful offenders. The age range of inmates confined at Milan is between 18 and 23, with some exceptions made for young persons of ages 24 to 26 who are sentenced pursuant to the provisions of the Youth Corrections Act. Housing is primarily open dormitory.

2. On Thursday evening, June 24, at approximately 7:30 p. m. inmates Foster and Williams were observed arguing in the Milan gym annex by correctional employees W. A. Wade and H. E. Bickford. Foster was holding a six-foot weight-lifting bar in his hands, gesturing and threatening to strike Williams. The above-named correctional personnel intervened and subdued the two inmates prior to any exchange of blows. Mr. Bickford, Milan's Recreational Instructor, instructed inmate Williams to report forthwith to the acting Watch Supervisor for that evening, Lt. Norman C. Laird.

3. Both men involved went to Lt. Laird's office and he discussed with them the basis of their problems. Foster claimed that the provocation for the subject incident was Williams' "strong arm" attempts to intimidate Foster into participating in homosexual acts with Williams. Williams at that time categorically denied Foster's allegations made in the presence of Lt. Laird, and furthermore, during trial, testified that he was only casually acquainted with Mr. Foster at the time the incident in the gym occurred.

4. After listening to each inmate's account, Lt. Laird counseled Foster and Williams concerning their mutual responsibilities to learn to settle differences without resorting to fighting. He advised both men that incidents such as the one that had taken place in the gym would not be tolerated at Milan. The men were warned that if they could not resolve their differences then and there, they would both be taken from the general inmate population and locked in segregation.

5. Both inmates assured Lt. Laird that as far as they were concerned the incident in the gym "was forgotten" and each assured the lieutenant that there would be no further problems between them. Upon receiving these assurances and determining to his satisfaction that the men were sincere, Lt. Laird formed a judgment that it was a proper procedure for segregation not to be imposed and he instructed both men to return to their dormitory.

6. Lt. Laird considered segregation almost a remedy of last resort that cannot be applied with effectiveness for periods of more than ten days. He also believed that segregation would not have prevented a future confrontation between Foster and Williams if the two men were determined to resolve their differences in a violent manner.

7. Both inmates were housed in the B–2 dormitory. Immediately following his meeting with Foster and Williams, Lt. Laird telephonically informed correctional officer D. E. Goddard, the officer assigned supervisory responsibility for the B–2 dormitory on Thursday evening, that the two men had been involved in an altercation in the gym annex and that he should keep an eye on the situation.

8. Although Officer Goddard did not observe any overt interaction between

the two men in the dormitory that evening, he sensed that the gym altercation had generated a great deal of tension among all the inmates in B–2. Mr. Goddard approached inmates Foster and Williams on an individual basis and discussed the matter with them. He warned them that he would not tolerate any further hostilities, and if necessary, he would transfer or segregate one or both men. Both Williams and Foster assured Mr. Goddard that there would be no problems. Nevertheless, Mr. Goddard wrote a memorandum to the Watch Supervisor prior to going off duty in which he noted the inmate tension existent in B–2, and added, ". . . that if the tension does not subside, one of these inmates should be moved to another unit." (Goddard's memorandum was introduced as Plaintiff's Exhibit Number 6.)

9. Late Thursday night, Captain Paul Ashworth was called back to the institution to investigate the circumstances surrounding a self-inflicted injury of another inmate. During Captain Ashworth's visit Lt. Laird informed him of the gym incident, his discussion with Williams and Foster, and his disposition of the matter.

10. On Friday morning, June 25, Captain Ashworth summoned both inmates to his office and confronted them with the information he had received from Lt. Laird. Mr. Goddard's memorandum had also been brought to his attention by that time. Once again, the two men represented that the Thursday evening incident had been the result of a misunderstanding, and that they were no longer experiencing any difficulty. Captain Ashworth observed no overt tension or anxiety on the part of either inmate during that interview, and based on their assurances, he resolved that they were sincere and that the matter was closed.

11. What transpired between the two men subsequent to the Friday morning meeting with Captain Ashworth is disputed by the inmates. According to plaintiff Williams, he had no further contacts with Foster on Friday; i. e., he did not in any respect approach or communicate with Foster. On the other hand, some 30 to 40 minutes after Williams was set on fire on Saturday morning, June 26, Foster confessed that he had set Williams on fire in retaliation for a sexual assault by Williams which had occurred Friday morning.[1] Inasmuch as the Court finds herein that plaintiff has failed to establish any negligence on the part of the defendant, its agents or employees, it is not necessary to resolve the factual issue of whether plaintiff did or did not attack Foster on Friday and thereby contribute to or assume the risk of his own injuries.

12. At no time on Friday, June 25, did Foster complain to any correctional personnel that Williams had sexually assaulted him, nor did such fact at any time come to the attention of the Milan staff by way of inmate rumor, an informant, or otherwise. Up until Saturday morning, the Milan correctional staff had reason to believe that both inmates were conducting themselves as they had indicated they would during the several counseling sessions with various officers.

13. Correctional Officer Darwin Leatherwood was made aware of the gym altercation and Mr. Goddard's memorandum when he came on duty in the B–2 dormitory office at 4:00 p. m., Friday, June 25. Mr. Leatherwood, however, did not discern any inmate unrest in B–2 on Friday night, nor did Williams or Foster exhibit any noticeable tension or anxiety.

14. There was no evidence or testimony presented which would support a finding that anyone on the Milan correc-

1. Although Foster did not make a trial appearance, counsel for both parties stipulated prior to trial that should he be called his testimony would be essentially that set forth above.

tional staff knew or should have known that Williams and Foster had had any problems after the altercation in the gym annex on Thursday evening.

15. There was no testimony presented establishing how Foster was able to obtain the contraband gasoline used to assault Williams. The Milan institutional policy in effect at the time required that such flammables be kept under lock and key in a secure area when not in use, and that use of flammables should be carried out at all times under the direct supervision of one of the staff members. These procedures had proven to be the most effective in minimizing inmate abuse of flammables.

16. Milan's procedure for discovering weapons and contraband which might be employed as weaponry paralleled that relied upon by other state and federal institutions. The procedure consists of periodic, irregular, unannounced "shakedowns" (searches) of prisoners and their dormitories or cells and additional "shakedowns" at any time an officer suspects an inmate to be in possession of contraband. There was no evidence or testimony presented to support any finding that correctional officers at Milan knew, or had reason to know, that Foster had obtained flammable contraband which would have warranted a search of his person or effects on Friday.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction under the Federal Tort Claims Act, 28 U.S.C., Section 1346(b) and Section 2671 et seq.

2. Federal prisoners have the right to sue the United States for injuries sustained in prison under the provisions of the Federal Tort Claims Act. United States v. Muniz, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963).

3. The liability of the United States under the provisions of the Federal Tort Claims Act is dependent upon whether a private individual under like circumstances would be liable under state law.

4. The State of Michigan does not hold a person liable without proof of negligence, or demonstration of absence of due care. See Steehler v. Fashion City of Michigan, Inc., 14 Mich.App. 76, 165 N.W.2d 306 (1968); Honorl v. J. T. Hudson Co., 10 Mich.App. 623, 160 N. W.2d 513 (1968).

5. Plaintiff must prove negligence on the part of the correctional officers charged with the duty of keeping him free from harm in order to recover. The duty of care owed by the Bureau of Prisons to federal prisoners is provided by 18 U.S.C., Section 4042, which provides as follows:

> The Bureau of Prisons, under the direction of the Attorney General, shall—
>
> (1) have charge of the management and regulation of all Federal penal and correctional institutions;
>
> (2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise;
>
> (3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States.
>
> . . . . . .
>
> This section shall not apply to military or naval penal or correctional institutions or the persons confined therein.

6. The defendant's duty under Section 4042 is not absolute but requires the exercise of ordinary diligence under the circumstances. Courts have consistently held that negligence is not established by mere proof that the plaintiff was assaulted by a fellow inmate. See Johnson v. United States, 258 F.Supp. 372, 376 (E.D.Va., 1966); affirmed by 4th Circuit (1968), unpublished opinion No. 11,060; Fleishour v. United States, 244 F.Supp. 762, 767 (N.D.E.D.Ill., 1965), affirmed 365 F.2d 126 (7th Cir., 1966); cert. den. 385 U.S. 987, 87 S.Ct.

597, 17 L.Ed.2d 448 (1966); Cohen v. United States, 252 F.Supp. 679 (N.D. Ga., 1966). Plaintiff is required to demonstrate by a preponderance of the evidence that certain negligent acts have taken place and as a result, he was injured. In this respect plaintiff has failed to sustain his burden of proof. Under the facts and circumstances of the instant action, negligence cannot be inferred from the event itself.

■ 7. The judgment exercised by correctional officers Laird and Ashworth admittedly involved certain risks, but it cannot be characterized as negligent. Their judgment involved the very type of "calculated risks" discussed in *Fleishour, supra,* which must be exercised daily by Bureau of Prisons supervisory personnel. The court in *Fleishour,* while recognizing that from time to time certain efforts on the part of correctional officers to encourage rehabilitation and responsible conduct by prisoners inevitably "backfire", observed ". . . [that the] standard practice in modern penal institutions is to take calculated risks in various aspects of prison life, housing, work, recreation, religious worship [etc.] so that prisoners may learn to get along with other persons as part of the rehabilitation process." 244 F.Supp. 762, 767.

Complete isolation would be the only certain method to insure against prison episodes of the type presented herein; and complete isolation would not only be physically very difficult, if not impossible, but also least likely to induce positive attitudes in and the rehabilitation of persons so treated. As stated by the Fourth Circuit in Johnson v. United States, *supra,* ". . . [d]emands of effective penal administration and rehabilitation may afford prisoners less than absolute security from harm by other inmates."

It might be noted, in addition to the recognized negative "fatal effect" on rehabilitation resultant from unnecessary confinements in segregation, that complete isolation for lengthy sentences in light of penology practices today could raise grave constitutional issues of cruel and unusual punishment and due process of law. In any event, the evidence and testimony presented in the instant action clearly support a finding that the decision not to isolate inmate Foster was reasonable and appropriate exercise of discretion, and entirely consistent with accepted penal practices.

■■ 8. Plaintiff failed to sustain his burden of proof with respect to his second theory of negligence; i. e., "that the institutional officers were negligent in permitting Foster to have access to a flammable liquid." As stated by the Supreme Court in *Muniz, supra,* federal correctional officers are not insurers of inmate safety. Further, this is not a question of *res ipsa loquitur.* Plaintiff is under a burden of proving by a preponderance of the evidence that certain negligent acts took place as the result of which this situation occurred. The Milan policies with regard to control of flammables and detection of contraband were reasonable, and there has been no showing of any negligent acts on the part of the United States. We cannot infer negligence from the act itself.

9. Plaintiff has failed to establish by a preponderance of the evidence that defendant was negligent in any respect.

10. Judgment must therefore be entered for the defendant.

11. As the Court has found that plaintiff has failed to establish negligence on the part of defendant, its agents, or employees, it need not reach the issues raised by defendant's affirmative defenses, that plaintiff was guilty of assaultive and aggressive behavior which proximately resulted in his injuries.

The foregoing shall constitute findings of fact and conclusions of law pursuant to Federal Rules of Civil Procedure 52(a).