**Mary V. JACKSON, Administratrix of the Estate of Adolphus Jackson, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. C74–57.**

United States District Court, N. D. Ohio, W. D.

March 22, 1976.

Peter M. Handwork, Toledo, Ohio, for plaintiff.

D. B. Waller, U. S. Dept. of Justice, Washington, D. C., for defendant.

## OPINION

## FINDINGS OF FACT

## AND

## CONCLUSIONS OF LAW

DON J. YOUNG, District Judge:

This is an action brought under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), by the plaintiff as Administratrix of the Estate of Adolphus Jackson, deceased. Adolphus Jackson will hereinafter be referred to as the decedent. The decedent died as the result of an attack by a fellow prisoner in the early morning hours of February 13, 1972, while he was an inmate of the Honor Camp at the Federal Correctional Institution at Marion, Illinois. The case was tried to the Court on March 9th and 10th, 1976. This opinion will serve as the Court's findings of fact and conclusions of law resulting from the trial.

The facts of the matter are relatively simple, and in the main are not in dispute.

The decedent had pleaded guilty to a charge of possession of a stolen government check and been sentenced to three years imprisonment. Execution of the sentence was suspended, and decedent was placed on probation. Thereafter, the decedent was found to have violated his probation in a great many respects, and the sentence of imprisonment was executed. Decedent was first sent to the federal prison at Terre Haute, Indiana, and thereafter transferred to the Honor Camp at Marion.

At the Honor Camp, a study-release program had been inaugurated under which certain inmates were permitted to attend college and vocational classes at John A. Logan College, a nearby community college. A number of inmates, as well as members of the prison staff, attended the college classes. Among them was the decedent, who had considerable ability as an artist. He was taking a course in sign-painting. There was no public transportation available, so the inmates on study-release were permitted to use a small bus belonging to the prison to get to and from their classes. No prison official accompanied the inmates, nor were they routinely searched upon their return from classes.

On the evening of February 12th, the decedent and the other student inmates went to the college and returned as usual. Although the students were permitted to have a small amount of pocket change, the decedent had a twenty dollar bill, in violation of the prison rules. At some time in the evening he went to a liquor store and undertook to purchase three fifths and two pints of vodka. The price of this exceeded twenty dollars, so he returned one of the pints of vodka to the shelf, but purchased the three fifths and one pint, which he took back to the institution. Purchase or possession of alcoholic beverages is a serious violation of the prison rules. Had decedent survived, he would have been subject to severe disciplinary sanctions.

While the evidence is not too clear in this regard, apparently the decedent returned to the Camp some time around ten-thirty

o'clock in the evening. He, another prisoner named Eugene Crim, and probably some of the other inmates of the dormitory, drank a quantity of the liquor. Nevertheless, there were no apparent signs of this activity, for the Camp was quiet all evening. At twelve o'clock midnight the regular twelve o'clock bed check was made, with no signs of any disorder or difficulty. The prison routine continued undisturbed until some time between one-fifteen and one-thirty o'clock A.M.

Prior to the events in question, a remodelling program had been begun under which the beds in the dormitory were divided by partitions into what were called cubicles. This work had not been completed, and a considerable quantity of material for constructing the cubicles was stacked in the dormitory. Among these materials were iron posts, or stanchions, about five or six feet long, and two inches in cross-section.

The inmate Crim was one of those whose beds had been enclosed in a cubicle. Crim is an Appalachian white. The decedent was a northern black. Crim was serving a sentence for interstate transportation of a stolen motor vehicle. He was not participating in the study-release program. While he and the decedent were acquainted, there had never been any difficulties between them. Neither of them had any record of violent or assaultive behavior either outside or inside prison. Both had been drinking on the night in question.

Some time after the twelve o'clock bed check, Crim left his cubicle and the dormitory. On his return, the decedent whistled to him. He ignored this. Thereafter decedent and another inmate came to Crim's cubicle and an argument ensued. Decedent struck Crim and stabbed him three times with what is referred to as an Exacto knife, although from the description it was more likely a Stanley knife. This is an implement with interchangeable razor-like blades used by artists and craftsmen. Although there was no evidence concerning the ownership of the knife, such tools are permitted in the Honor Camp, and would be a necessity for one studying in a sign painting class.

It is reasonable to assume that the knife belonged to the decedent. After the affray, the handle of the knife was found under decedent's body, about at waist level. Part of a blade was found in Crim's cubicle, and another part of a blade on a bed near where decedent fell.

After the attack on Crim, other inmates removed the decedent, and returned with him to the foot of his own bed, which was almost diagonally across the dormitory from Crim's cubicle, a distance of perhaps sixty feet. Crim armed himself with a cubicle stanchion and started after the decedent. He was disarmed, but re-armed himself and came to where decedent was standing. Crim struck decedent on the back of his head with the stanchion, at least once, and perhaps again after decedent had fallen.

At that point, the guard on duty was told of the trouble. He gave an alarm, and both correctional and medical officers responded in force.

Because of the racial difference involved, the major concern at the moment was to cool things down to eliminate any racial disturbances. A few of the inmates of the dormitory, including Crim, who was bleeding profusely, were removed to the prison because they seemed much upset. By the next day, it appeared that there were no racial elements in the quarrel, and that the racial differences between the two participants was not creating any tensions in the inmate population.

The decedent was removed from the dormitory to the prison hospital, and as quickly as possible removed from there to a hospital in St. Louis, where the services of a neurosurgeon were available. He died without regaining consciousness in the early hours of February 14th, as the result of massive skull fractures and brain damage.

After investigation, the district attorney declined to prosecute Crim. Crim was charged with violation of the prison rules, found in violation, transferred to another prison, and deprived of his good time, although the good time was ultimately restored to him.

In a search of the dormitory immediately after the affray, two empty vodka bottles, a fifth and a pint, and a quart thermos bottle two-thirds full of liquor were found concealed behind the building supplies stack against the east wall of the building. It does not appear that the rest of the vodka purchased by the decedent, or the bottles, were ever found.

There are two legal problems presented, first, whether the Government was negligent, and second, whether the plaintiff could have recovered in a wrongful death action against a private individual under the law of the State of Illinois, where the event took place.

Plaintiff contends that the Government was required by 18 U.S.C. § 4042 to provide for the decedent's safety, and negligently failed to do so. Section 4042(2) and (3) provide in part that the Bureau of Prisons shall ". . . provide for the safekeeping, . . ." and ". . . provide for the protection . . . of all persons . . . convicted of offenses against the United States; . . ."

From this, plaintiff argues that the decedent was not safely kept and protected, because the Government, by creating honor camps with reduced security, establishing study release programs, and not closely guarding inmates in release programs, or searching them on their return from classes, took a calculated risk of such happenings as occurred in this case. Therefore, plaintiff contends when the risk that was taken results in injury, the Government should respond in damages.

The Government replies to plaintiff's contention by saying that assuming that there is an element of risk in honor camps and study or work release programs, the only risks are of runaway or of developing improper personal relationships with people outside the prison, not such a unique affair as the events here. The evidence shows that the death of the decedent is the only known incident of a killing of one honor camp resident by another.

■ It is clear that § 4042 does not make the Government an insurer of the safety of prisoners. *Fleishour v. United States,* 244 F.Supp. 762, 767 (N.D.Ill.1965), *aff'd,* 365 F.2d 126 (7th Cir.), *cert. denied,* 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966). Under the Tort Claims Act, there must be fault upon the part of a Government employee to establish liability. There is no respondeat superior relationship between the Government and a prisoner. *Sapp v. United States,* 227 F.2d 280 (5th Cir. 1955). It is true that in the case of *Cohen v. United States,* 252 F.Supp. 679 (N.D.Ga.1966), recovery was allowed for injuries inflicted by a fellow prisoner. However, in that case, which occurred in a maximum security institution, the prisoner who committed the assault was known to be psychotic and extremely dangerous and one who was required to be kept in isolation to prevent him from doing what he did, so that the prison authorities were clearly negligent in not isolating the assaulter. This perhaps justifies the holding against the usual rule that the chain of causation is broken by an independent intervening cause, since the Government's negligence was continuing as long as the psychotic prisoner was not confined, and his mindless act was not an intervening cause.

■ To adopt the plaintiff's arguments in this case would in practical effect make the defendant an insurer of the safety of its prisoners, for there can be no doubt whatever that no one could reasonably have expected any one of the prisoners in the honor camp to make a violent assault upon, much less kill, another, as happened here. Consequently, the defendant is entitled to judgment in its favor on the grounds that it was not in violation of any duty, or guilty of any failure to exercise ordinary care, toward the plaintiff's decedent.

There is further reason, however, why the defendant must prevail in this case. The Federal Tort Claims Act, particularly in 28 U.S.C. § 1346(b), limits the Government's liability to situations where ". . . a private person . . . would be liable to the claimant under the law of the place where the act or omission [took place]."

In this case, where the events happened in Marion, Illinois, the law of the State of Illinois would apply. Under that law, contributory negligence of the deceased is a bar to recovery in a wrongful death action. *Maki v. Frelk,* 40 Ill.2d 193, 195, 239 N.E.2d 445, 447 (1968). That law also requires the plaintiff to plead and prove the decedent's freedom from contributory negligence. *Schmidt v. Blackwell,* 15 Ill.App.3d 190, 304 N.E.2d 113 (1973); *Siebens v. Konicek,* 108 Ill.App.2d 300, 247 N.E.2d 453 (1969). So far as pleading is concerned, the State law could not control over the Federal Rules of Civil Procedure, but regardless of pleading, the burden was upon the plaintiff to prove that the decedent was free from contributory negligence.

The factual situation here does not lend itself well to the application of the law of negligence, for both the decedent and his fellow prisoner were guilty of trespass *vi et armis,* and not trespass on the case. Complex problems of the defense of *son assault demesne* are presented. However, even if those be resolved in favor of the plaintiff's decedent, it can hardly be said that the intervening assaults break the chain of causation to the decedent's original wrongful act in purchasing, bringing back to the honor camp, and drinking the vodka, along with Crim and other prisoners. Assaults are a common and reasonably foreseeable consequence of the purchase of intoxicating liquor. The Court, upon the evidence adduced, has no doubt that the plaintiff's decedent was guilty of contributory negligence, and that this negligence was one of the proximate causes of his death.

For all of the foregoing reasons, this Court concludes that the defendant is entitled to a verdict in its favor, and against the plaintiff, and judgment will be rendered by the clerk accordingly.